ONEIDA TRIBE OF INDIANS OF
WISCONSIN, Plaintiff,

v.

STATE OF WISCONSIN; Bronson C. La Follette, Individually and as Attorney General of the State of Wisconsin; Wisconsin Bingo Control Board, Defendants.

No. 81–C–54.

United States District Court,
W. D. Wisconsin.

July 27, 1981.

---

Milton Rosenberg, Madison, Wis., Francis R. Skenandore, Onèida, Wis., for plaintiff.

John Niemisto and Donald Johns, Asst. Attys. Gen., Madison, Wis., for defendants.

## OPINION AND ORDER

CRABB, Chief Judge.

This is a civil action for injunctive and declaratory relief. Plaintiff Oneida Tribe of Indians of Wisconsin occupies a reservation situated in Brown and Outagamie Counties in the state of Wisconsin. Plaintiff seeks a ruling that Wis.Stats. Ch. 163, relating to bingo operations, may not be lawfully enforced on the Oneida reservation. On February 27, 1981, I entered an order denying plaintiff's motion for a preliminary injunction on the ground that plaintiff had failed to show that it would suffer irreparable harm from any of the named defendants if the injunction were not granted. The case is now before the court on defendants' motion to dismiss.

Plaintiff makes the following factual allegations: it conducts bingo games pursuant to a tribal ordinance adopted by the Oneida Business Committee; the games are conducted solely by tribal members on tribal property at the Oneida Civic Center, located on the Oneida Indian Reservation, Brown County, Wisconsin; pursuant to a tribal ordinance and the tribal constitution, the proceeds of the bingo operations are appropriated solely for the purposes of promoting the health, education and welfare of the members of the Tribe and the Oneida Community; proceeds from the games are distributed to the Oneida Community Nursing Home, the Oneida Community Health Center, the Oneida Tribal School, Oneida Youth Programs, and other such services; and proceeds from the bingo operations contribute a vital share of the revenues of the Tribe.

Plaintiff alleges further that the constitution of the State of Wisconsin was amended in 1973 to permit bingo games; that the Wisconsin Legislature enacted Ch. 163 Wis.Stats., to regulate the conduct of bingo games by means of licensing, control and taxation; that the Oneida bingo operations do not comply with the provisions of Wis.Stats. Ch. 163; that the head of the Wisconsin Department of Justice, defendant La Follette, is authorized to enforce compliance with Ch. 163; that on January 29, 1980, defendant La Follette issued an opinion stating that the Oneida bingo operations were subject to the provisions of Ch. 163 and that compliance with the statute was required.

In addition, plaintiff alleges that on February 1, 1980, acting on the express advice of defendant La Follette, Royce A. Finne, assistant District Attorney for Brown County, notified plaintiff that the district attorney's office was preparing to take enforcement action against plaintiff, pending notification by plaintiff that it would comply with the provisions of Ch. 163; and that the Wisconsin Bingo Control Board had requested that the District Attorney of Brown County take enforcement actions against the Oneida bingo operations. Plaintiff alleges that after further communications and meetings between representatives of plaintiff and Brown County, plaintiff received a letter dated December 15, 1980, from the sheriff of Brown County, who stated that the Oneida bingo operations did not comply with Ch. 163, and threatened that one or more enforcement actions would

be taken against plaintiff unless it ceased and desisted from conducting bingo games.

Defendants' motion to dismiss is based essentially on two arguments. The first involves construction of the Act of August 15, 1953, Pub.L.No. 83–280, 67 Stat. 588, 18 U.S.C. § 1162, 28 U.S.C. § 1360 (commonly referred to as Public Law 280), which granted limited civil and general criminal jurisdiction to the State of Wisconsin in "all Indian country within the state except the Menominee Reservation." [1] Defendants argue that because the state's bingo laws provide a criminal penalty for persons who do not conduct bingo games in compliance with the scheme established in Chapter 163, Wis.Stat., the bingo laws are "criminal" laws for purposes of the jurisdiction granted under Public Law 280. In short, the state argues that its bingo laws are "criminal-prohibitory" rather than "civil-regulatory" in nature.[2]

Citing *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980), defendants assert as their second argument that the state has independent jurisdiction to enforce its bingo laws on the Oneida Indian Reservation because the state would not be "infring[ing] on the right of reservation Indians to make their own laws and be ruled by them . . . ." This argument appears to rest on defendants' assertion that the operation of the tribal bingo games "involves the conduct of activities that clearly extend beyond the boundaries of the Oneida Reservation." This argument can be disposed of summarily. As plaintiff correctly points out, there is no basis in the record before this court for the assertion of fact contained in defendants' brief in support of their motion to dismiss. Therefore, even if defendants are correct in their interpretation of the *White Mountain Apache Tribe* opinion, they cannot prevail without further development of the record.

In opposition to defendants' motion to dismiss, plaintiff argues that it need not comply with Wisconsin's bingo laws because of its treaty-based immunity to enforcement of state laws, and because of the tribe's right to self-government. Plaintiff argues also that Public Law 280 does not confer jurisdiction on the State of Wisconsin to enforce its bingo laws on the Oneida Reservation because the laws are "civil-regulatory" in nature, and thus do not fall within the act's grant of criminal jurisdiction.

Two related questions must be answered in order to resolve defendants' motion to dismiss: (1) whether Wisconsin's bingo laws are civil or criminal; and (2) what Congress intended when it passed Public Law 280 and conferred jurisdiction on the State of Wisconsin to enforce its criminal laws in Indian country. These questions must be considered in the light of relevant concepts of Indian sovereignty and self-government.[3]

---

1. Public Law 280 underwent several amendments generally not relevant to a decision in this case. *See generally* American Law Division, Library of Congress, 94th Cong., 1st Sess., Background Report on Public Law 280, 27 (Comm.Print 1975).

2. Defendants concede implicitly that Public Law 280's grant to Wisconsin of civil jurisdiction over Indian land, including the Oneida Reservation, does not alone give the state power to enforce its bingo laws on the reservation. Any argument to the contrary would be foreclosed by *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976).

3. Both parties in this case agree that there is a proper case or controversy to invoke this court's jurisdiction. Plaintiff asserts jurisdiction under 28 U.S.C. §§ 1362, 2201 and 2202. In cases somewhat similar to this case, there arose an issue whether there was a sufficient case or controversy to satisfy the requirement of Article III of the United States Constitution. In *Rincon Band of Mission Indians v. County of San Diego*, 495 F.2d 1 (9th Cir. 1974), the court dismissed a case similar to this one for lack of a case or controversy. In another case factually similar to this one, the court concluded that the threat of prosecution and the plaintiff's interest in conducting bingo games were sufficient to meet the requirement of case or controversy. *Seminole Tribe of Florida v. Butterworth*, 491 F.Supp. 1015 (S.D.Fla.1980). In the case at bar, I am satisfied that there exists a proper case or controversy: "[a]ll that is required by Article III is that '[t]he controversy . . . be definite and concrete, touching the legal relations of parties having adverse legal interests.'" *Bickham v. Lashof*, 620 F.2d 1238, 1247 (7th Cir. 1980) (citation omitted).

## OPINION

### I. CONCEPTS OF TRIBAL SOVEREIGNTY

Under early views of tribal sovereignty, Indians were held to possess broad authority to govern themselves. In a case holding that the State of Georgia could not enforce its laws on the Cherokee Reservation, which was within the external boundaries of the state, the Supreme Court held:

> The Cherokee nation, then, is a distinct community, occupying its own territory, with boundaries accurately described, in which the laws of Georgia can have no force... The whole intercourse between the United States and this nation is, by our Constitution and laws, vested in the government of the United States.

*Worcester v. State of Georgia*, 31 U.S. (6 Pet.) 515, 561, 8 L.Ed. 483 (1832). Under this view, Indian tribes retained internal sovereignty on their reservations, except to the extent that sovereignty was overridden by Congress acting pursuant to Article I, Section 8, Clause 3 of the United States Constitution, which gives Congress the power to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes," and Article II, Section 2, Clause 2, which governs federal responsibility for making treaties. *See McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 172 n.7, 93 S.Ct. 1257, 1262 n.7, 36 L.Ed.2d 129 (1973).

The view of an Indian reservation as " 'a distinct community, occupying its own territory . . . in which the laws of [the states] can have no force...' " has been "modified . . . in cases where essential tribal relations were not involved and where the rights of Indians would not be jeopardized, but the basic policy of *Worcester* has remained... Essentially, absent governing Acts of Congress, the question has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them." *Williams v. Lee*, 358 U.S. 217, 219–20, 79 S.Ct. 269, 270, 3 L.Ed.2d 251 (1959) (citations omitted). *Accord Kake Village v. Egan*, 369 U.S. 60, 72–76, 82 S.Ct. 562, 569–571, 7 L.Ed.2d 573 (1962).

With the modification of the view that Indian tribes retain basic sovereign powers on the reservation, the precise nature of tribal and state authority over on-reservation matters has become less clear. It does appear, however, that in the absence of consent of the tribes or express authorization by Congress, state law does not govern on-reservation conduct involving only tribal members. *Moe v. Salish & Kootenai Tribes*, 425 U.S. 463, 480–81, 96 S.Ct. 1634, 1644–45, 48 L.Ed.2d 96 (1976) (state may not impose cigarette taxes on on-reservation sales to reservation Indians, and may not impose personal property taxes on property owned by reservation Indians); *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (state may not tax income derived from reservation sources by reservation Indians). On the other hand, states do have the power to tax off-reservation activities of Indians. *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

In some cases, tribal laws may control activities of non-Indians on the reservation. *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (state court had no jurisdiction over suit brought by non-Indian doing business on the reservation who sought payment for goods bought by reservation Indians on the reservation); *see also Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 152–54, 100 S.Ct. 2069, 2080–81, 65 L.Ed.2d 10 (1980). However, tribes are not free to impose their laws on all reservation activities of non-Indians. *Montana v. United States*, —— U.S. ——, —— – ——, 101 S.Ct.

The prior denial of plaintiff's motion for preliminary injunction does not conflict with this conclusion. In denying that motion, I found that the plaintiff had not shown it would suffer irreparable injury from the named defendants if the injunction did not issue. Although the threat of *immediate* harm stems from the officials of Brown County, none of whom are defendants, there is a sharp dispute between plaintiff and the named defendants.

1245, 1256–59, 67 L.Ed.2d 493 (1981) (tribe has no inherent or other authority to regulate non-Indian fishing and hunting on reservation land owned in fee by nonmembers of the tribe); *Oliphant v. Suquamish Indian Tribe,* 435 U.S. 191, 208–210, 98 S.Ct. 1011, 1020–21, 55 L.Ed.2d 209 (1978) (tribes lack jurisdiction to prosecute non-Indians in tribal courts).

Despite the fact that the concept of inherent tribal sovereignty has been eroded and made less clear in cases decided since *Worcester v. State of Georgia,* 31 U.S. 515, 8 L.Ed. 483 the concept still survives. In *United States v. Wheeler,* 435 U.S. 313, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978), the Court stated that

> "Indian tribes are unique aggregations possessing attributes of sovereignty over both their members and their territory... [They] are a good deal more than 'private voluntary organizations.'" The sovereignty that the Indian tribes retain is of a unique and limited character. It exists only at the sufferance of Congress and is subject to complete defeasance. But until Congress acts, the tribes retain their existing sovereign powers. In sum, Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status.

*Id.* at 323, 98 S.Ct. at 1086 (citations omitted).

According to the Court, many attributes of sovereignty were lost when tribes were incorporated into the United States, and other attributes of sovereignty have been divested by treaties and statutes. The Court distinguished between sovereign powers retained by the tribe and those divested:

> The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between an Indian tribe and nonmembers of the tribe. Thus, Indian tribes can no longer freely alienate to non-Indians the land they occupy... They cannot enter into direct commercial or governmental relations with foreign nations... [T]hey cannot try nonmembers in tribal courts....

These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their external relations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status.

*Id.* at 326, 98 S.Ct. at 1087 (citations omitted). *See also Montana v. United States,* 101 S.Ct. at 1257–58.

At the outset, this analysis of the changing concepts of tribal sovereignty may not seem immediately relevant to the relatively narrow question presented by the motion to dismiss in this case: what Congress intended when it granted criminal jurisdiction to Wisconsin over Indian land within the state. But as the Supreme Court has emphasized repeatedly, "[t]he Indian sovereignty doctrine is relevant, then, not because it provides a definitive resolution of the issues in this suit, but because it provides a backdrop against which the applicable treaties and federal statutes must be read." *McClanahan,* 411 U.S. at 172, 93 S.Ct. at 1262. Thus, in interpreting Public Law 280, the court must bear in mind this backdrop "against which vague or ambiguous federal enactments must always be measured." *White Mountain Apache Tribe v. Bracker, supra,* 100 S.Ct. at 2583.

## II. PUBLIC LAW 280 AND WISCONSIN'S BINGO LAWS

The relevant portion of Public Law 280 provides:

> [The State of Wisconsin] shall have jurisdiction over offenses committed by or against Indians ... in Indian country ... to the same extent that [the State of Wisconsin] has jurisdiction over offenses committed elsewhere within [the] State ... and the criminal laws of [the State of

Wisconsin] shall have the same force and effect within such Indian country as they have elsewhere within the State....

18 U.S.C. § 1162.

"State laws generally are not applicable to tribal Indians on an Indian reservation except where Congress has expressly provided that State laws shall apply." *McClanahan v. Arizona State Tax Comm'n*, 411 U.S. at 170–71, 93 S.Ct. at 1261, *quoting* U.S. Dept. of the Interior, Federal Indian Law 845 (1958). Therefore, as noted earlier in this opinion, a determination of the extent of Wisconsin's jurisdiction over the activities of the Oneida tribe requires construction of the congressional enactment applicable to this case,[4] as well as a determination of whether the state's bingo laws are civil or criminal.

**A.  Civil-Regulatory v. Criminal-Prohibitory**

Prior to 1973, the Wisconsin constitution and Wisconsin statutes forbade the conduct of any lottery, including bingo. In 1973, the state's constitution was amended and now provides:

The legislature shall never authorize any lottery, or grant any divorce.

(1) The legislature may authorize bingo games licensed by the state, and operated by religious, charitable, service, fraternal or veterans' organizations or those to which contributions are deductible for federal or state income tax purposes. All profits must inure to the licensed organization and no salaries, fees or profits shall be paid to any other organization or person.

Wis.Const., Art. IV, § 24.

Pursuant to this change in the state's constitution, the Wisconsin legislature enacted Wis.Stats. Chapter 163, which governs the conduct of bingo in the state, and amended Wis.Stat. § 945.01, pertaining to definitions relating to gambling, to provide: "'Lottery' does not include bingo or a raffle as defined in s. 163.03 if conducted under ch. 163." Wis.Stat. § 945.01(2)(am).

The essence of the defendants' argument is that if bingo is not conducted in compliance with chapter 163 and Section 24 of Article IV, persons conducting the games are subject to prosecution under Wis.Stats., Chapter 945 and, in some cases, under Wis. Stat. § 163.54.

When chs. 945 and 163 Stats., and Wisconsin Constitution art. IV, sec. 24 are considered together, it is clear that the laws applicable to persons engaged in unlicensed bingo are primarily criminal rather than civil regulatory. It is only after an entity applies for and is granted a state license to conduct bingo that the regulatory provisions of ch. 163 become effective... [S]ince, under the Wisconsin statutory scheme, the state laws being applied are primarily criminal in nature, the state does have authorization under Public Law 280 to enforce those statutes against unauthorized bingo activities conducted by Oneida Tribe members on the Oneida Reservation.

Brief of Defendants in Support of Motion to Dismiss at 7 (footnote omitted).

In addition, defendants argue that bingo generally is a prohibited activity under Wisconsin law, and that only those organizations defined in the state's constitution and statutes have been exempted from the prohibition. "The Wisconsin Constitution and Wisconsin Statutes thus carve out an exception to proscribed gambling activities for a limited but well defined group of organizations." Reply Brief of Defendants in Support of Motion to Dismiss at 2.

In opposition to defendants' motion to dismiss, plaintiff argues that the laws governing bingo in Wisconsin are nothing more than an exercise of the state's power to grant franchises, which constitutes an exercise of civil regulatory authority, and that "the use of penal sanctions to enforce and protect the grant of these valuable fran-

---

4. Defendants argue that Wisconsin's definition of criminal laws should govern this case. To a certain extent, that argument is correct. However, because the state's jurisdiction must be derived from a federal statute, federal law ultimately controls the extent of the state's jurisdiction.

chises does not alter the fundamental character of the power being exercised." Brief of Plaintiff in Opposition to Motion to Dismiss at 5. Plaintiff points out that Wis. Stats. § 163.11(1) confers the privilege of conducting bingo games on certain favored or nonprofit organizations within the state, and Wis.Stat. § 163.80 imposes an occupational tax on the gross proceeds of bingo games.

In addition, plaintiff attacks defendants' reliance on the licensing provision of chapter 163. Plaintiff argues that the licensing requirement simply does not reach the host of regulations on the play of bingo, Wis. Stat. § 163.51, or the taxing provisions of the statute. Plaintiff concedes that prior to the change in Wisconsin law in 1973, when playing bingo was forbidden in the state, Wisconsin could exercise jurisdiction to enforce its ban on bingo anywhere in the state, including the Oneida Reservation. But once the laws were changed to allow the general populace to play bingo, the state no longer had jurisdiction under Public Law 280 to regulate the play of bingo on the Oneida Reservation.

Two cases deal with an interpretation of the "civil-criminal" problems similar to those presented by the case at bar. In *United States v. Marcyes*, 557 F.2d 1361 (9th Cir. 1977), appellants operated fireworks stands, selling to the public, on an Indian reservation located in the state of Washington. They were convicted in federal court of possessing unmarked, unclassified and dangerous fireworks in violation of Washington state law. The state law was made applicable to the Indian reservation under the Assimilative Crimes Act, 18 U.S.C. § 13 and § 1152, which provides:

> Whoever within or upon [Indian country] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State ... in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13. In short, the Assimilative Crimes Act made the state criminal laws of Washington applicable in federal court for prosecutions of acts committed in Indian country within the state, a situation analogous to Public Law 280's grant of jurisdiction to states to enforce their criminal laws in Indian country.

In *Marcyes*, appellants argued "that the ACA only incorporates the general criminal code or prohibitory laws of a state and cannot be utilized to enforce the penal provisions of state regulatory laws such as Washington's fireworks laws." *United States v. Marcyes*, 557 F.2d at 1364. The court agreed that this argument had merit:

> In *Johnson v. Yellow Cab Transit Co.*, 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1944), the Supreme Court, in footnote 8, indicated that a strong argument exists that Congress did not intend to include the penal provisions of a state regulatory system with the ACA. The rationale for this argument is obvious; a state could thereby enforce its regulatory system on the federal jurisdiction by making criminal any failure to comply with those regulations (i. e., licenses, permits, etc.). Appellants argue that this result is even stronger when applied to an Indian reservation because a state would thereby be able to implement all of its regulatory provisions on Indian reservations and thereby destroy the strong concept of tribal sovereignty carried on in such cases as *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), and *Santa Rosa Band of Indians v. Kings County*, 532 F.2d 655 (9th Cir. 1975).

*Id.*

The court concluded that appellants' argument could not prevail because Washington's fireworks laws were prohibitory, not regulatory:

> Even though the Washington scheme allows for limited exceptions ... its intent is to prohibit the general possession and/or sale of dangerous fireworks and is not primarily a licensing law.

> The possession of fireworks is not the same situation encountered in other regu-

latory schemes such as hunting or fishing, where a person who wants to hunt or fish merely has to pay a fee and obtain a license. The purpose of such statutes is to regulate the described conduct and to generate revenues. In contrast, the purpose of the fireworks laws is not to generate income, but rather to prohibit their general use and possession in a legitimate effort to promote the safety and health of all citizens.

*Id.*

As noted earlier, defendants attempt to demonstrate that Wisconsin's bingo laws are prohibitory because only those organizations defined in the constitution and statutes of the state are allowed to conduct bingo games, and only under regulated circumstances. Defendants' argument misses one important point: the general populace of the state of Wisconsin is allowed to play bingo. Moreover, the state law governing bingo appears to provide penalties for those who illegally conduct bingo games rather than for those who merely play in such games. *See e. g.,* Wis.Stat. § 163.54. Thus, because it appears that Wisconsin's bingo laws are not designed to prohibit the general populace from playing bingo, it seems that those laws are regulatory rather than prohibitory, at least under the analysis employed by the court in *United States v. Marcyes.*

In another case strikingly similar to the case at bar, the court applied the *Marcyes* approach and concluded that Florida's bingo laws could not be applied to regulate bingo on the Seminole Reservation located within the state of Florida. *Seminole Tribe of Florida v. Butterworth,* 491 F.Supp. 1015 (S.D.Fla.1980). Like Wisconsin's laws governing the conduct of bingo, the Florida statutes limit the conduct of bingo to certain defined organizations and regulate the conduct and frequency of games. *Id.* at 1016–17. In addition, violators of the Florida bingo statutes may be subjected to penal sanctions. *Id.* at 1019. Also, as in Wisconsin, Florida's bingo statute falls within an exception to an anti-lottery provision in the Florida constitution. *Id.* at 1018–19, *citing Carroll v. State,* 361 So.2d 144 (Fla.1978).

Applying the *Marcyes* prohibitory-regulatory analysis, the *Butterworth* court concluded that the Florida bingo laws were regulatory and nonenforceable on Indian land:

> [T]he court discerns a decided distinction between the Florida Legislature's intent and that of the Washington legislature. Washington sought to prohibit the general possession and/or sale of dangerous fireworks. *Marcyes,* at 1364. It seems plain that Florida, in permitting bingo to be run by certain groups in a restricted manner, has acknowledged certain benefits of bingo and has chosen to regulate rather than prohibit.

*Id.* at 1019–20.

In the case at bar, it also appears that the Wisconsin legislature and the general populace, as evidenced by the constitutional amendment of 1973, have determined that bingo playing is generally beneficial and have "chosen to regulate rather than prohibit." Thus, it appears that Wisconsin's bingo laws are civil-regulatory and, as noted in footnote 2 of this opinion, not enforceable by the state in Indian country. *Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710.

Although I conclude that under the *Marcyes-Butterworth* analysis Wisconsin's bingo laws are civil rather than criminal, I admit to a certain uneasiness in reaching that conclusion. Because it seems a rather mechanical approach to the issue presented, the analysis alone is not wholly satisfactory. However, when that analysis is coupled with the "backdrop" concept discussed earlier, I am satisfied that the conclusion reached on this motion is based on sound principles of construction of laws pertaining to Indian tribes and of current policy regarding tribal independence.

*B. Public Law 280 Construction and Backdrop of Sovereignty*

If defendants are to prevail on this motion to dismiss, they must show that Wisconsin's power to enforce its bingo laws on the Oneida reservation stems from Public Law 280. The language of the statute

gives no clear indication as to what extent Congress intended to allow states to apply penal sanctions to otherwise regulatory schemes and thus to obtain power to apply statutes in Indian country under the rubric of enforcing "criminal laws." The legislative history of Public Law 280 is sparse, and provides little assistance in construing the statute. *See e. g., Bryan v. Itasca County,* 426 U.S. at 379, 96 S.Ct. at 2106. As the Court noted in *Bryan,* "The primary concern of Congress in passing Pub.L. 280 . . . was . . . the problem of lawlessness on certain Indian reservations, and the absence of adequate tribal institutions for law enforcement." *Id. See also* H.R.Rep.No. 848, 83d Cong., 1st Sess., *reprinted in* [1953] U.S. Code Cong. & Ad.News 2409.

Keeping in mind the backdrop of Indian sovereignty against which Public Law 280 must be measured, as well as "that 'eminently sound and vital canon' . . . that 'statutes passed for the benefit of dependent tribes . . . are to be liberally construed, doubtful expressions being resolved in favor of the Indians,'" *Bryan v. Itasca County,* 426 U.S. at 392, 96 S.Ct. at 2112 (citations omitted), I conclude that when Congress conferred jurisdiction on the State of Wisconsin to enforce its criminal laws on the Oneida Reservation, Congress intended to limit the exercise of that jurisdiction to enforcement of laws generally prohibiting activities that the state determined are too dangerous, unhealthy, or otherwise detrimental to the well-being of the state's citizens. I conclude also that Congress did not intend to allow states to use licensing requirements in an attempt to create jurisdiction to enforce otherwise civil regulations on Indian reservations. *See Johnson v. Yellow Cab Transit Co.,* 321 U.S. 383, 389 n.8, 64 S.Ct. 622, 625 n.8, 88 L.Ed. 814 (1944).

Finally, I note that the conclusion that the State of Wisconsin's bingo laws cannot be enforced on the Oneida Reservation under Public Law 280 appears to be in keeping with present federal policy encouraging tribal self-government. *See United States v. Wheeler,* 435 U.S. at 322–26, 98 S.Ct. at 1085–1087; *Bryan v. Itasca County,* 426 U.S. at 388–89, n.14, 96 S.Ct. at 2110–2111

n.14. *See also* the Indian Self-Determination and Education Assistance Act, 25 U.S.C. § 450 *et seq.*; The Indian Financing Act of 1974, 25 U.S.C. § 1451 *et seq.*; Title IV of the Civil Rights Act of 1968, 25 U.S.C. §§ 1321–1326 (amending Public Law 280 to require tribal consent as a condition to further state assumptions of the jurisdiction provided in 18 U.S.C. § 1162 and 28 U.S.C. § 1360).

## ORDER

For the reasons stated above, IT IS ORDERED that defendants' motion to dismiss is DENIED.