**IOWA TRIBE OF INDIANS OF KANSAS AND NEBRASKA, a federally recognized Indian tribe, Plaintiff-Appellant,**

v.

**STATE OF KANSAS, et al., Defendants-Appellees.**

No. 84–1931.

United States Court of Appeals, Tenth Circuit.

April 2, 1986.

Francis R. Skenandore, Oneida, Wis. (Richard C. Wetzler of Bennett, Lytle, Wetzler, Winn & Martin, Prairie Village, Kan., with him, on briefs), for plaintiff-appellant.

Timothy G. Madden, Asst. Atty. Gen., Topeka, Kan. (Robert T. Stephan, Atty. Gen. of Kan., Topeka, Kan., and John L. Weingart, Asst. Brown Co. Atty., Hiawatha, Kan., with him, on brief), for defendants-appellees.

Before BARRETT and McKAY, Circuit Judges, and WINDER, District Judge.*

McKAY, Circuit Judge.

The issue in this case is whether the State of Kansas has jurisdiction to prosecute members of the Iowa Tribe of Indians of Kansas and Nebraska for selling "pull-tab cards" in connection with bingo games conducted on the Tribe's reservation.

The Iowa Tribe of Indians of Kansas and Nebraska is a federally-recognized Indian tribe whose reservation is located in Brown County, Kansas. In an attempt to generate revenue for its health, education, welfare, and safety programs, the Tribe turned to the trendy state practice of raising revenues through government-sponsored gambling. To this end, the Tribe enacted a bingo ordinance to regulate, license and control the operation of bingo games on the Tribe's reservation. As defined by the bingo ordinance, the game of "bingo" includes the sale of pull-tab cards. These cards are identical to the prize cards that many grocery stores distribute to attract customers. A pull-tab card is made of paper and has a factory-sealed cover that is removed by the player to determine what, if any, prize has been won. Although the ordinance makes non-members of the Tribe ineligible to apply for a bingo license, the bingo games are open to the public and are attended by Indians and non-Indians.

On October 21, 1982, the Kansas Attorney General issued a formal opinion in response to an inquiry from the Kansas Department of Revenue concerning the Department's ability to enforce the Bingo Tax Act, Kansas Stat.Ann. § 79–4701 to –4711 (1984), on Indian reservations located in the State of Kansas. 82 Op.Att'y Gen. 221 (1982). The Attorney General advised the Department of Revenue that the Kansas Act, 18 U.S.C. § 3243 (1982), confers jurisdiction on the State of Kansas "over offenses committed by or against Indians on Indian reservations, except as to certain major offenses (not including violation of gambling laws)." *Id.* at 4. Relying on *Seminole Tribe of Florida v. Butterworth,* 658 F.2d 310 (5th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982), and *Oneida Tribe of Indians of Wisconsin v. State of Wisconsin,* 518 F.Supp. 712 (W.D.Wisc.1981), the Attorney General interpreted the Kansas Act as granting jurisdiction to Kansas only over offenses that are "prohibitory," as opposed to "regulatory," in nature.[1] The Attorney

---

* Honorable David K. Winder, United States District Judge for the District of Utah, sitting by designation.

1. In reviewing the basis of the Kansas Attorney General's opinion, we have considered the implications of the "prohibitory/regulatory" dichotomy that has developed in determining the authority of states to enforce their criminal statutes on Indian reservations. *See Barona Group of Capitan Grande Band of Mission Indians v. Duffy,* 694 F.2d 1185 (9th Cir.1982), *cert. denied,* 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Seminole Tribe of Florida v. Butterworth,* 658 F.2d 310 (5th Cir.1981), *cert. denied,* 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *United States v. Marcyes,* 557 F.2d 1361 (9th Cir.1977); *Oneida Tribe of Indians of Wis-*

General determined that the provisions of the Bingo Tax Act are "regulatory" in nature and therefore cannot be enforced on Indian reservations. However, the Attorney General advised the Department of Revenue that the State could prosecute the sale of pull-tab cards on Indian reservations under the gambling provisions of the Kansas Criminal Code because those statutes are "prohibitory" in nature. Apparently, no form of gambling other than bingo is permitted anywhere in Kansas.

In 1983, the County Attorney of Brown County, Kansas, brought criminal charges against members of the Iowa Tribe for selling pull-tab cards at tribal bingo games. The County Attorney alleged that the sale of pull-tab cards violated various sections of the Kansas Criminal Code prohibiting the dealing in or possession of a "gambling device." Faced with the threat of continued prosecution, the Tribe brought this action, seeking declaratory and injunctive relief on the ground that Kansas is without jurisdiction to enforce its gambling laws on the Tribe's reservation. The State of Kansas counterclaimed, seeking a declaratory judgment that the Kansas Act, 18 U.S.C. § 3243 (1982), confers jurisdiction on Kansas over state crimes committed by or against Indians on Indian reservations. The district court ruled in favor of the State of Kansas, concluding that "18 U.S.C. § 3243 confers upon the State of Kansas

complete (albeit not exclusive) criminal jurisdiction." Record, vol. 1, at 116. The Tribe has appealed, challenging the district court's interpretation of the Kansas Act.

In 1940, Congress enacted the Kansas Act, 18 U.S.C. § 3243 (1982), conferring criminal jurisdiction on the State of Kansas over state offenses committed by or against Indians on Indian reservations located within the State of Kansas. The Act provides as follows:

> Jurisdiction is conferred on the State of Kansas over offenses committed by or against Indians on Indian reservations, including trust or restricted allotments, within the State of Kansas, to the same extent as its courts have jurisdiction over offenses committed elsewhere within the State in accordance with the laws of the State.

> This section shall not deprive the courts of the United States of jurisdiction over offenses defined by the laws of the United States committed by or against Indians on Indian reservations.

While the first paragraph of the Act appears to confer complete criminal jurisdiction on the State of Kansas, the second paragraph preserves federal jurisdiction over "offenses defined by the laws of the United States committed by or against Indians on Indian reservations." The Tribe

---

*consin v. State of Wisconsin,* 518 F.Supp. 712 (W.D.Wisc.1981). The Kansas Attorney General correctly relied on these cases when he informed the Kansas Department of Revenue that the Kansas Act, 18 U.S.C. § 3243 (1982), does not confer jurisdiction on the State of Kansas to enforce the penal provisions of the Kansas Code that are properly characterized as "regulatory" offenses. Under this line of cases, a state may not enforce its criminal statutes on Indian reservations unless the prohibited activity contravenes the state's public policy. This rule is based on the notion that Congress did not intend to confer criminal jurisdiction on the states over activity that takes place on the reservations unless that activity is so fundamentally evil that the state has undertaken to prohibit it altogether within its boundaries.

It could well be argued that the underlying evil which has historically justified criminalization of gambling is that the outcome of the transaction is based upon chance rather than a

value-for-value bargain. Viewed in this light, it could further be argued that the exemption of one such transaction, such as bingo, from the penal provisions of the state's criminal code, requires a finding that gambling, as such, is not against the state's public policy. While this argument has some force, the Tribe has not elected to pursue it. Moreover, the existing cases seem to have taken a more mechanical approach in determining whether a state may enforce the provisions of its penal code on Indian reservations. Without further litigation of this issue, we do not feel justified in characterizing the gambling provisions of the Kansas Criminal Code as "regulatory" offenses. Additionally, because the record does not indicate whether Kansas permits grocery stores to distribute prize cards to their customers, we cannot determine whether application of the "prohibitory/regulatory" analysis to the sale of pull-tab cards would lead to the conclusion that such activity is not against the public policy of the State of Kansas.

argues that the reference to "offenses defined by the laws of the United States" includes state offenses adopted into federal law by the Assimilative Crimes Act, 18 U.S.C. § 13 (1982).[2] The Tribe contends that, because federal jurisdiction under the Assimilative Crimes Act is exclusive of state jurisdiction, *Williams v. United States,* 327 U.S. 711, 714 n. 10, 66 S.Ct. 778, 780 n. 10, 90 L.Ed. 962 (1946); *see also* Clinton, *supra* note 2, at 523 n. 94, the second paragraph of the Act preserves exclusive federal jurisdiction over state offenses committed by or against Indians on the Kansas reservations. Thus, the Tribe asserts, the State of Kansas has no jurisdiction to enforce its gambling laws on the Tribe's reservation. Conversely, the State of Kansas argues that the second paragraph of the Act merely retains *concurrent* federal jurisdiction over "offenses defined by the laws of the United States."

The Tribe relies primarily on two cases that have examined the legislative history of the Kansas Act and concluded that Congress intended to preserve exclusive federal jurisdiction over the major offenses set forth in the Major Crimes Act, 18 U.S.C. § 1153 (1982). *Youngbear v. Brewer,* 415 F.Supp. 807 (N.D.Iowa 1976), *aff'd,* 549 F.2d 74 (8th Cir.1977) (per curiam); *State v. Mitchell,* 231 Kan. 144, 642 P.2d 981 (1982). *Youngbear* was a habeas corpus action brought by an Indian convicted in an Iowa court of murdering another Indian on a reservation. The petitioner argued that murder was a major crime over which the federal government had exclusive jurisdiction under the Major Crimes Act, 18 U.S.C. § 1153 (1982), and that the State of Iowa had no jurisdiction to prosecute him for murder in a state court. The State of Iowa asserted that it had jurisdiction under a federal statute whose language is identical

to that of the Kansas Act except that it confers jurisdiction on the State of Iowa rather than the State of Kansas. In construing the jurisdictional statute at issue in *Youngbear,* the federal district court relied in part on the legislative history of the Kansas Act, which was considered a model for its Iowa counterpart. *Youngbear,* 415 F.Supp. at 812–13. After analyzing the legislative history of the Kansas Act, the *Youngbear* court concluded that when Congress conferred criminal jurisdiction on Kansas and Iowa it did not intend to abrogate the federal government's exclusive jurisdiction over the offenses set forth in the Major Crimes Act, 18 U.S.C. § 1153 (1982). Thus, the court held, the State of Iowa had no jurisdiction to try the petitioner for a murder that was committed on an Indian reservation.

In *State v. Mitchell, supra,* the Kansas Supreme Court considered the same question that was decided by the federal district court in *Youngbear.* The defendant in *Mitchell* had been convicted in state court of murdering another Indian on an Indian reservation. On appeal, the defendant argued that the Kansas state court had no jurisdiction to try him for murder, because the Major Crimes Act conferred exclusive jurisdiction on the federal government over murders committed by or against Indians on Indian reservations. As here, the State of Kansas argued that the Kansas Act conferred concurrent jurisdiction on the State to prosecute major crimes committed by or against Indians on Indian reservations. The Kansas Supreme Court observed that *Youngbear* had addressed this same issue and concluded that "[t]he legislative history of 18 U.S.C.A. § 3243 clearly indicates the proviso was intended to preserve exclusive federal jurisdiction over the major crimes." *Mitchell,* 642 P.2d at 985.

**2.** One commentator has described federal jurisdiction on Indian lands under the Assimilative Crimes Act, 18 U.S.C. § 13 (1982), as a type of "double derivative jurisdiction." Clinton, *Criminal Jurisdiction Over Indian Lands: A Journey Through A Jurisdictional Maze,* 18 Ariz.L.Rev. 503, 534 (1976). The Assimilative Crimes Act incorporates local state law into federal law and applies that law to federal enclaves located with-

in the state. The Assimilative Crimes Act is applied to Indian reservations by the General Crimes Act, 18 U.S.C. § 1152 (1982), as part of "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States." *Id. See also Williams v. United States,* 327 U.S. 713–14, 66 S.Ct. 779–80 (1946).

In the instant case, the district court noted that neither the *Youngbear* or *Mitchell* courts had considered a report prepared by E.K. Burlew, Acting Secretary of the Interior, which is contained in the Act's legislative history. After analyzing the legislative history, the district court determined that *Youngbear* and *Mitchell* were wrongly decided and that Congress intended to confer complete, concurrent jurisdiction on the State of Kansas over offenses committed by or against Indians on Indian reservations.

The sale of pull-tab cards is clearly not within the ambit of the Major Crimes Act, 18 U.S.C. § 1153 (1982). Therefore, we find it unnecessary to decide whether Congress intended to preserve exclusive federal jurisdiction over the offenses enumerated in that Act. The only conceivable basis for federal jurisdiction in this case is the Assimilative Crimes Act, 18 U.S.C. § 13 (1982). Accordingly, our inquiry is confined to the question whether Congress intended to preserve exclusive federal jurisdiction over non-major state offenses that are incorporated into federal law under the Assimilative Crimes Act. This question, of course, was not decided by the *Youngbear* or *Mitchell* courts, and, therefore, we express no opinion as to whether those cases were correctly decided.

The principal legislative history of the Kansas Act is contained in H.R.Rep. No. 1999, 76 Cong., 3rd Sess. (1940). The House Report contains, among other things, a letter written by Secretary Burlew to Representative Will Rogers, Chairman of the House Committee on Indian Affairs. Secretary Burlew's letter explains the impetus behind the Kansas Act:

Federal criminal statutes applicable to Indian reservations are limited in their scope, particularly with respect to injuries inflicted by one Indian upon the person or property of another Indian, *and leave some major crimes as well as practically all minor offenses outside the jurisdiction of the Federal courts.* As the authority of the several States over wrongful or illicit acts committed upon tribal or restricted Indian lands extends in the main only to situations where both the offender and the victim are white men, the maintenance of law and order within Indian reservations is largely dependent upon tribal law and tribal courts. In the case of the four Kansas reservations, however, no tribal courts have existed for many years, and the Indians do not desire their reestablishment at this late date. With the approbation of the tribes concerned, the State courts of Kansas have in the past undertaken the trial and punishment of offenses committed on these reservations, including those covered by Federal statutes. The legality of this practice being questioned recently, the tribal councils of the four Kansas tribes have recommended the enactment of legislation authorizing its continuance by a transfer of jurisdiction to the State. (emphasis added)

H.R.Rep. No. 1999, 76th Cong., 3rd Sess. 2 (1940). A Department of the Interior memorandum accompanying Secretary Burlew's letter sheds further light on the "jurisdictional maze" that existed on the Kansas reservations in 1940:

The Federal criminal statutes applicable to Indian reservations do not provide a complete code for the maintenance of law and order within these reservations. Insofar as offenses committed by Indians against Indians are concerned, virtually the only acts penalized by Federal law are the ten major crimes listed in section 328 of the Criminal Code, as amended (18 U.S.C. 548), and the jurisdiction over all other offenses where both the offender and the victim are Indians is relegated to the tribes by section 2146 of the Revised Statutes, as amended (25 U.S.C. 218). Insofar as offenses committed by Indians against white men or by white men against Indians are concerned, "the general laws of the United States as to the punishment of crimes committed in any place within the sole and exclusive jurisdiction of the United States, except the District of Columbia," are extended to Indian reservations by section 2145 of

the Revised Statutes (25 U.S.C. 217). However, the Federal penal statutes applicable to places within the sole and exclusive jurisdiction of the United States, as set out in sections 272–288 and 311–322 of the Criminal Code (18 U.S.C. 451–467, 511–522), cover only a limited number of offenses. *And while for the purpose of filling in the gaps in this list section 289 of the Criminal Code, as amended (18 U.S.C. Supp. IV, 468), extends certain State criminal laws to places under the exclusive jurisdiction of the United States, the application of this provision to Indian reservations over which the United States has not acquired exclusive political jurisdiction from the State is extremely uncertain.*

. . . .

On the four Indian reservations in Kansas; however, there are no tribal courts and there have been none for many years. In the absence of such courts, offenses committed on these reservations and involving Indians have been prosecuted in the State courts, even where the criminal act charged constituted one of the major offenses listed in section 328 of the Criminal Code. For a considerable period the State courts accepted jurisdiction in the cases thus brought before them. These State law prosecutions were had with the approval of the tribes concerned, and the exercise of criminal jurisdiction by the State courts was to their general satisfaction. Recently, however, the authority of the State courts to proceed in these cases has been questioned, and it now appears that they are actually without authority to entertain such proceedings, as no jurisdiction over criminal offenses involving Indians has been relinquished to Kansas. Since tribal courts do not exist on the Kansas reservations, *and since the jurisdiction of the Federal courts extends only to limited categories of offenses, many acts universally deemed wrongful, as, for example, the embezzlement*

*by one Indian of money belonging to another Indian, may escape punishment if the present situation is not remedied.* (emphasis added).

The only logical interpretation of the Kansas Act, in light of Secretary Burlew's letter and the accompanying memorandum, is that it was intended to fill a jurisdictional void that existed on the Kansas reservations in 1940. Moreover, the letter and memorandum make clear that the drafters of the Act did not believe that federal jurisdiction on Indian reservations extended to non-major state offenses.[3] It is apparent, then, that Congress did not intend to preserve federal jurisdiction over such offenses—exclusive or otherwise—since Congress did not believe that federal jurisdiction extended to these offenses in the first instance. We must therefore conclude that non-major state offenses that are incorporated into federal law by the Assimilative Crimes Act, 18 U.S.C. § 13 (1982), are not "offenses defined by the laws of the United States" within the meaning of the second paragraph of the Kansas Act.

The Tribe places great emphasis on the fact that the original version of the bill which ultimately became the Kansas Act expressly provided for "concurrent" federal-state jurisdiction and for the modification of the Major Crimes Act, 18 U.S.C. § 1153 (1982), and the General Crimes Act, 18 U.S.C. § 1152 (1982). The Tribe argues that the deletion of these provisions from the final version of the bill evinces congressional intent to retain exclusive federal jurisdiction over the offenses that are within the ambit of the Major Crimes Act and the General Crimes Act. This argument fails to recognize that the drafters of the Kansas Act did not believe that the federal courts had jurisdiction over nonmajor state offenses. Thus, Congress' failure to modify the Major Crimes Act and the General Crimes Act does not suggest that Congress intended to restrict the States's jurisdiction over nonmajor state offenses. Further-

---

**3.** Apparently, it was not until 1946 that it became clear that the Assimilative Crimes Act does apply to "Indian country." *See Williams v. Unit-* *ed States,* 327 U.S. 711, 713–14, 66 S.Ct. 778, 779, 90 L.Ed. 962 (1946).

more, a more likely explanation for the deletion of the reference to "concurrent" jurisdiction in the final version of the bill is contained in the following passage in Secretary Burlew's letter:

> [T]he bill, as now worded, does not express with entire accuracy the legal situation as it now exists or is intended to be created. The bill proposes to relinquish concurrent jurisdiction to the State of Kansas, intending thereby to give the State jurisdiction of all types of crimes, whether major or minor, defined by State law. However, the Federal Government has exercised jurisdiction only over major crimes. Therefore, strictly speaking, this is not a case of relinquishing to a State a jurisdiction concurrent with that of the United States, but a case of conferring upon the State complete criminal jurisdiction, retaining, however, jurisdiction in the Federal courts to prosecute crimes by or against Indians defined by Federal law.

H.R.Rep. No. 1999, 76th Cong., 3rd Sess. 3 (1940). Although it appears that Secretary Burlew erred in believing that federal jurisdiction extended only to major offenses,[4] it is clear that, in his view, the Act conferred broader jurisdiction on the State of Kansas than that exercised by the federal government. Thus, Secretary Burlew proposed the amended version of the bill to reflect more accurately the extent of jurisdiction conferred on Kansas.

Perhaps the most persuasive evidence of congressional intent is a letter written by Representative W.P. Lambertson, a Kansas congressman, urging approval of the amended version of the bill. The letter, which is contained in the House Report, states: "The Government here relinquishes to the State full jurisdiction over the Indians for small offenses." H.R.Rep. 1999, 76th Cong., 3rd Sess. 2 (1940).

In light of Representative Lambertson's statement and the report prepared by Secretary Burlew, we are convinced that, in enacting the Kansas Act, Congress meant what it said and intended to confer jurisdiction on the State of Kansas over non-major state crimes. The question whether Congress also intended to confer jurisdiction on Kansas over major crimes is not before us. We hold only that the State of Kansas has jurisdiction over non-major state offenses committed by or against Indians on Indian reservations located in the State of Kansas.

As additional support for its argument that the State lacks jurisdiction over gambling offenses committed on Indian reservations, the Tribe contends that the Indian Gambling Act, 15 U.S.C. § 1175 (1982), preempts state jurisdiction over such offenses. The Indian Gambling Act provides:

> It shall be unlawful to manufacture, recondition, repair, sell, transport, possess, or use any gambling device in the District of Columbia, in any possession of the United States, within Indian country as defined in section 1151 of title 18 or within the special maritime and territorial jurisdiction of the United States as defined in section 7 of title 18.

We agree with the district court that the Indian Gambling Act does not preempt state jurisdiction to prosecute the sale of pull-tab cards. First, the term "gambling device," as defined in 15 U.S.C. § 1171 (1982), is limited to slot machines and other mechanical devices. It does not include pull-tab cards. Second, in view of the narrow definition of the term "gambling device," we cannot say that, in enacting the Indian Gambling Act, Congress so occupied the field regarding the regulation of gambling that Kansas is without jurisdiction to enforce its gambling laws on the Kansas reservations.

We have carefully considered the Tribe's other arguments and find them to be without merit. To the extent that the district court held that Kansas has jurisdiction over

---

**4.** This statement is contradicted by the Department's memorandum, accompanying Secretary Burlew's letter, which states that general federal enclave laws, although limited in number, were also applicable on Indian reservations.

non-major offenses, the judgment of the district court is AFFIRMED.