**PUEBLO OF SANTA ANA, et al., Plaintiffs,**

v.

**Donald P. HODEL, Defendant.**

**Civ. A. No. 85–2866.**

United States District Court, District of Columbia.

May 1, 1987.

---

Howard E. Shapiro, Van Ness, Feldman, Sutcliffe & Curtis, Washington, D.C., B. Reid Haltom, Alan R. Taradash, Nordhaus, Haltom, Taylor & Taradash, Albuquerque, N.M., for plaintiffs.

Larry M. Corcoran, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

In this proceeding, the Pueblo of Santa Ana ("Pueblo"), an Indian tribe, challenges a decision of the Secretary, Department of Interior ("Secretary") denying its proposal to construct and operate a dog racing facility on its reservation that would allow pari-mutuel wagering. The proposal was rejected on grounds it violated the Assimilative Crimes Act ("ACA" or "Act"), 18 U.S.C. § 13. That statute, incorporating state criminal laws for areas within federal jurisdiction, is discussed more fully, *infra*, p. 1309.

Plaintiff Pueblo and co-plaintiff Santa Ana Non-Profit Enterprise ("Santa Ana Enterprise" or "Enterprise"), its operating arm, seek judicial review, specifically declaratory and injunctive relief, invalidating the Secretary's decision to disapprove the proposed racing facility project. Plaintiffs also challenge the Secretary's decision that,

under relevant statutes, his approval is required to carry out the project.[1]

Cross-motions for summary judgment have been fully briefed and ably argued. After considering the parties' legal memoranda and the materials submitted in the nature of an administrative record, the Court concludes that the Interior Secretary had authority to review the contract and otherwise to rule on the merits of the plaintiffs' proposal. Plaintiffs' application for equitable relief is denied.

## BACKGROUND

The material facts of this case are undisputed. Plaintiff, Pueblo is a federally recognized Indian tribe living on the Santa Ana Reservation in the State of New Mexico. The 552-member tribe is governed by a traditional form of tribal government, the Pueblo Council of the Santa Ana Pueblo ("Council"), composed of all male heads of households.

On October 25, 1984, the Council enacted Ordinance No. 84-0-01, (Mat. at 30),[2] establishing the plaintiff Santa Ana Enterprise for the purpose of "providing for the health, education, religious affairs and welfare of the Pueblo ... through creation of opportunities and appropriate utilization of its resources to provide funds for such purposes." Article I of the Ordinance states that the Enterprise "shall be a nonprofit instrumentality of the Pueblo of Santa Ana." Article III empowers the Enterprise to buy and sell non-tribal trust land and assign, mortgage, lease or otherwise encumber any interest in tribal trust lands that are assigned or leased to it by the Pueblo. It is also empowered to make contracts, receive governmental grants, and sue or be sued in its organizational name. Finally, Article VII provides that agreements of the Enterprise are binding on that entity and its property alone, and that Pueblo and its officers shall have no liability under such agreements. The Enterprise has no shareholders and is managed by a Board of Directors selected by the Pueblo Council and removable for cause.

On November 12, 1984, the Pueblo Council adopted Resolution No. 84-R-02, leasing approximately 100 acres of tribal trust land to the Santa Ana Enterprise and giving it full power to "control, develop, operate and manage said property." (Mat. at 43.) Earlier, on October 25, 1984, the Council enacted Ordinance No. 84-0-02 (Mat. at 111) which authorized animal racing[3] and parimutuel betting to be licensed and regulated by a five-member Santa Ana Racing Commission ("Commission"). Immediately thereafter, on October 31, 1984, the Commission issued a license to Santa Ana Enterprise authorizing it to own and operate a greyhound racetrack and conduct pari-mutuel betting within that facility. On the same date, it entered into a Management Agreement (Mat. at 47) with Wayne Strong, a Kansas businessman and greyhound racing expert. Strong was designated as Operator-Manager of the proposed facility under a 15-year contract to "design, construct, improve, develop, manage, operate, and maintain the [leased property] as a premier facility for the conduct of pari-mutuel greyhound races." Santa Ana Enterprise "dedicated" the property to the Management Agreement and promised that any business development near the property would be designed so as not to interfere with operations under the Management Agreement. Both parties agreed not to allow any encumberance on the property

---

**1.** The relevant statutes, 25 U.S.C. §§ 177, 415 and 81, are discussed *infra* pp. 1304 & 05. They provide generally that the Secretary must approve contracts and leases which the Indians enter into with non-Indians.

**2.** "Mat." refers to Materials Relied Upon by the Secretary in Preparing his Statement of Opinion and Policy, dated August 6, 1985, filed in this proceeding on March 12, 1986.

**3.** The Ordinance speaks at all times of "racing" and "races." It is clear from various other pro-

visions that it refers to animal races and is not limited to horse or dog races. However the proposed contract with the developer of the racing facility, which was the document under consideration by the Secretary, originally limited the facility to dog racing. After the Secretary made his recommendation disapproving the dog racing project, the Commission amended its contract to permit both dog racing and/or horse racing.

without the prior written consent of the other. The Commission issued a license to Strong to manage the greyhound track.

In November 1984, the Pueblo submitted its proposal to the Secretary of Interior, including all of the previously adopted ordinances, resolutions, and agreements, and requested approval or, in the alternative, a statement that such approval was unnecessary.[4] Despite Pueblo's pleas for timely action on the proposal and considerable support for the project from the surrounding non-Indian communities and officials, an early decision on the project was not forthcoming. Concerns were raised within Interior about the economic viability of the project, and the humaneness of dog racing.

Most importantly, the legality of the project became an issue because the Attorney General of New Mexico asserted that pari-mutuel dog racing was illegal under New Mexico law and should therefore be considered a criminal activity on the Pueblo reservation under the federal Assimilative Crimes Act. The ensuing controversy led the Area Office of the Bureau of Indian Affairs to shift responsibility for consideration of the project to the Departmental level. Accordingly, on April 11, 1985, the Pueblo's proposal was transferred to the Bureau of Indian Affairs in Washington, D.C., where the controversy continued with Pueblo's counsel, urging Secretarial approval. Other interested parties also contacted Interior Department officials and members of Congress to express their views.

Faced with prospects of further delay, and emboldened by a recently announced Supreme Court decision that Indian tax ordinances do not require Department of Interior approval, *Kerr-McGee v. Navajo Tribe*, 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985), the Pueblo argued to the Secretary that approval of the dog racing project was not necessary after all. On May 29, 1985, the Pueblo Council enacted a second Resolution, No. 85–R–21, which substituted a tribal land assignment for the lease of tribal lands previously accomplished by the November 12, 1984 Resolution, *supra* page 1302. Then, on June 3, 1985, the Pueblo withdrew its request for Interior Department approval.

Notwithstanding this withdrawal, on August 6, 1985, the Secretary addressed a letter to the Governor of the Pueblo and the New Mexico Attorney General (Mat. at 442) in which he opined that pari-mutuel betting on dog racing within the Pueblo reservation would violate the Assimilative Crimes Act. This opinion was based on the Secretary's evaluation of the competing legal arguments of the Pueblo and the Attorney General and on a policy, announced in the letter, of deference to a state's construction of its own laws.[5] While declining to specifically threaten federal prosecution, the Secretary also stated that he was advising the Department of Justice of his view on the legality of the proposal. Finally, the letter outlined the Secretary's position that his approval was required of both the Pueblo's lease (or assignment) of land and the Management Agreement with Wayne Strong.[6]

The Secretary's letter prompted a number of events. On August 16, 1985, the Racing Commission amended the license issued to Santa Ana Enterprise to allow

---

**4.** The submission to the Secretary entitled Santa Ana Pueblo Economic Development Proposal: Request for Approval of Ordinances was directed to the Albuquerque Area Office of the Bureau of Indian Affairs. The cover letter to the proposal is dated November 12, 1984, but the proposal also includes resolutions passed by the Pueblo Council on that date.

**5.** This policy was cited by the Secretary in a subsequent decision to withdraw approval of a jai alai project proposed by the Gila River Indian Community in Arizona. *See* Plaintiffs' Motion for Summary Judgment, app. C (letter from Ross Swimmer, Asst. Secretary-Indian Affairs to

Donald R. Antone, Sr., Governor, Gila River Indian Community).

**6.** The Secretary stated: "[I]t will be the policy of this Department in this and in similar instances to exercise its authority under 25 U.S.C. § 81 (or under any other appropriate statute) to review [gambling management contracts] to the extent they appear to be within the scope of the statute." The Assistant Secretary for Indian Affairs reiterated this policy in a letter to tribal chairman and revised guidelines for the review of tribal bingo management contracts, both dated April 7, 1986. *See* Plaintiffs' Motion for Summary Judgment, apps. D, E.

pari-mutuel betting on horse racing as well as greyhound racing. Since it had withdrawn its request for approval, the Pueblo apparently intended to proceed with the project. However, financing previously arranged for the project was withdrawn. Several banks which had extended commitments, specifically stated that they rescinded their financial support in response to the Secretary's decision disapproving the Pueblo's plan.

Following these developments plaintiffs filed this lawsuit. The parties' cross motions for summary judgment present two issues. The first, whether Secretarial approval is required of the transactions and contracts underlying the Pueblo's animal racing proposal. If such approval is required, second, whether the Secretary's determination to withhold approval was correct. A threshold question of the second issue is whether the Secretary's August 6 letter invoking the Assimilative Crimes Act, constitutes an administrative decision ripe for judicial review.

## ANALYSIS

### I. *The Requirement of Secretarial Approval*

In his August 6, 1985 letter, the Secretary contended that approval of the dog-racing project was required under a number of statutory provisions. With very little discussion, he asserted authority to review the assignment of tribal lands to the Santa Ana Enterprise under 25 U.S.C. §§ 177 and 415. (Mat. at 448.) Those sections provide in pertinent part:

*§ 177 Purchases or grants of lands from Indians*

No purchase, grant, lease, or other conveyance of lands ... from any Indian nation or tribe of Indians, shall be ... [valid] ... unless ... made by treaty or convention entered into pursuant to the Constitution.

*§ 415 Leases of restricted lands*

Any restricted Indian lands, whether tribally or individually owned, may be leased by the Indian owners with the approval of the Secretary of the Interior

for ... educational, recreational, or business purposes....

Plaintiffs maintain that the sections are inapplicable since they are intended to protect against transfers of Indian lands to non-Indians. They argue that as long as the intra-tribal transfer does not have the effect of conveying an interest in the land to non-Indians, Secretarial approval is not required. Since the assignment of lands to Santa Ana Enterprise does not convey an interest to non-Indians, no approval of Council Resolution No. 85–R–21 is needed.

■ The Secretary does not really dispute this position; instead, he stresses his obligation to approve the management contract between Santa Ana Enterprise and Wayne Strong under 25 U.S.C. § 81. In his August 6 letter, he expressed at some length the view that the section might be applicable. (*See* Mat. at 448–51.) In this proceeding, he reasserts that position much more definitively and forcibly. Section 81 provides in relevant part:

*§ 81 Contracts with Indian Tribes or Indians*

No agreement shall be made by any person with any tribe of Indians ... for the payment or delivery of any money ... or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, ... unless....

\*   \*   \*   \*   \*   \*

Second. It shall bear the approval of the Secretary of Interior ... endorsed upon it.

In three recent cases, courts have interpreted the language of this section to require Secretarial approval of management contracts with non-Indians to construct, develop, and operate bingo parlors on tribal trust lands: *A.K. Management Co. v. San Manuel Bank of Mission Indians,* 789 F.2d 785 (9th Cir.1986); *Wisconsin Winnebago Business Committee v. Koberstein,* 762 F.2d 613 (7th Cir.1985); *United States ex rel. Shakopee v. Pan American Management Company,* 616 F.Supp. 1200 (D.Minn.1985), app. dismd. 789 F.2d 632 (8th Cir.1986). These cases indicate quite

clearly that the Management Agreement is "relative to [Indian] lands" and the type of contract covered by § 81. The Agreement is closely tied to the Pueblo's property and limits the tribe's ability to encumber it. *Cf. Wisconsin Winnebago*, 762 F.2d at 615, 619; *Shakopee*, 616 F.Supp. at 1205.

Plaintiffs concede that the Management Agreement is "relative to their lands," but argue that Secretarial approval is not required because § 81 applies only to agreements between non-Indians and Indian tribes. They contend that Santa Ana Enterprise is a separate entity for purposes of contracting with Wayne Strong to develop the Pueblo lands.[7] Thus, they believe the bingo management agreement cases are distinguishable because in all three cases the contracts at issue were entered into by the Indian tribes themselves, rather than a tribal entity as here.

Relying on two earlier Circuit Court opinions, plaintiffs contend that this difference is significant and dispositive. In *Inecon Agricorporation v. Tribal Farms, Inc.*, 656 F.2d 498 (9th Cir.1981), the Fort Majove Indian tribe entered into agricultural land development and management contracts with Inecon. Potential lenders refused to deal with the tribe because it was not subject to federal and state court jurisdiction. Consequently the tribe created a separate corporation and incorporated it under Arizona laws. Later, Tribal Farms lost an arbitration award under the contracts and Inecon brought suit to enforce the decision. Tribal Farms attempted to avoid liability by arguing that the contracts were void because they had not been properly approved by the Interior Secretary. The Court ruled that § 81 did not apply, and therefore approval had not been necessary, because "Tribal Farms is an Arizona corporation and thus does not fall within the protected class of 'tribe of Indians or individual Indians' covered by the statute."

*Id.* at 501. The Pueblo argues that, similarly, Santa Ana Enterprise does not fall within the protected class of § 81.

Plaintiffs also rely on *Sac & Fox Tribe of Indians of Oklahoma v. Apex Construction Co., Inc.*, 757 F.2d 221 (10th Cir.1985), *cert. denied*, 474 U.S. 850, 106 S.Ct. 146, 88 L.Ed.2d 121 (1985). There an Indian tribe had secured a federal grant from the Department of Commerce for construction of a tribal cultural center. A contractor was paid to perform the work, but later sought to rescind the contract when structural defects were discovered, arguing that the contract required Secretarial approval. The court disagreed, holding that § 81 was designed to protect the funds of the Tribe. Since all of the money for the contract came from the government rather than the tribe, the statute did not apply. Plaintiffs argue, therefore, that the statute does not apply to contracts entered into by Santa Ana Enterprise because it has no power to bind or obligate the funds of the Pueblo in any way. Under Ordinance No. 84–0–01, the Pueblo is not liable for activities or indebtedness of the Enterprise.

A close analysis of *Sac & Fox* reveals that it is contrary to the plaintiffs' position. The Tenth Circuit specifically did not address the district court's ruling that the construction contract was not relative to Indian lands, determining instead § 81 does not apply to a contract obligating only government grant monies. *Id.* at 222. The decision described tribal funds as funds raised through the sale of tribal resources or "other dispositions of tribal property." *Id.* at 223. Here, however, even though there is no risk of liability to the Pueblo from the Strong contract, tribal funds are implicated. While Santa Ana Enterprise cannot obligate tribal funds directly, it is empowered to obligate the lands which the tribe leased to it.[8] It pledged in the

---

**7.** The Court does not question the tribe's power to set up a separate entity to act in the interests of the sovereign tribe. *See Keifer & Keifer v. Reconstruction Financial Corporation*, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939); *Navajo Tribe v. Bank of New Mexico*, 556 F.Supp. 1 (D.N.M.1980), *aff'd*, 700 F.2d 1285 (10th Cir. 1983). It does, however, raise issue with the

tribe's chameleon-like effort to clothe itself with Indian status for § 177 purposes and non-Indian status for § 81 purposes.

**8.** Under its establishing ordinance, Santa Ana Enterprise has full power to assign, mortgage, or encumber any interest in trust lands of the

management agreement not to encumber the land without the consent of Wayne Strong and has given Strong the exclusive right to control the development, construction, and operation of a facility on tribal trust property. It thus has the power to do the very things with the Pueblo's land over which Congress wanted to give the Secretary of Interior some supervisory role. *See Wisconsin Winnebago,* 762 F.2d at 619.

A close review of the *Inecon* case also reveals it fails to support plaintiffs' argument. In contrast to Tribal Farms, which as a valid Arizona corporation, was deemed a separate entity no longer under the operation of § 81, Santa Ana Enterprise is not a separate corporation, designated instead in Ordinance No. 84–0–02 as a "non-profit instrumentality of the Pueblo of Santa Ana." Nor does it hold itself out as a separate corporate entity. It has no shareholders and its directors are appointed and can be removed by the Pueblo Council.

Moreover in both *Inecon* and this case, the tribes asserted their tribal status when it suited their purposes and avoided tribal status when it did not. The Pueblo organization here argues that Santa Ana Enterprise is a tribal entity for purposes of the lease agreement with the tribal council and therefore argues that the agreement is not subject to review by the Secretary of Interior under 25 U.S.C. § 415. It then contends that Santa Ana Enterprise is *not* a tribal entity for purposes of the contract with Strong and therefore also not subject to review under § 81.

Plaintiffs' position requires a tortured reading of the interrelationship of the two statutes. The Court recognizes and affirmatively supports the prevailing judicial and political doctrines which favor tribal sovereignty and instruct courts to construe any statutory ambiguities in favor of the Indians, *see Solem v. Bartlett,* 465 U.S. 463, 472, 104 S.Ct. 1161, 1167, 79 L.Ed.2d 443 (1984); *McClanahan,* 411 U.S. 164, 174, 93 S.Ct. 1257, 1263, 36 L.Ed.2d 129. However this doctrine promoting Indian sovereignty cannot be utilized to twist the literal wording of the statutes.

Congress enacted each statute with a similar purpose in mind: to protect the tribes and tribal lands from exploitation and abuse by non-Indians. Congress determined that establishing a federal trust relationship which required the Secretary of Interior to oversee all contracts would best protect tribal sovereignty.[9] See generally M. Price & R. Clinton, *Law & the American Indian,* 731–747 (1983 ed.). Congress could not have mandated that the Secretary review all leases and contracts between Indian and non-Indian only to permit the tribes to avoid review when they deem provident. Congress' intent to insulate Indians and their land from exploitation by non-Indians, *see A.K. Management,* 789 F.2d at 787, would be thwarted if review by the Department of Interior of contracts of this type could be so easily avoided.

The Court holds that Secretarial approval of the Santa Ana Enterprise's contract with Wayne Strong is required by 25 U.S.C. § 81.

## II. *Review of Secretary's Decision to Withhold Approval*

The Secretary believes that once his authority to review the Pueblo's proposal is upheld, no further judicial action is appropriate because the August 6, 1985 letter does not constitute a final decision on the proposal that is ripe for review. Plaintiffs

---

Pueblo which the Pueblo assigns to it. Mat. at 31 (Ordinance 84–0–01, art. III(A)).

**9.** Congress has never clearly delineated the scope of the Secretary's trust duties and the level of discretionary administrative oversight. If Congress wanted to maximize tribal self determination, the Secretary should be limited to performing ministerial functions and rubber stamping and recording leases. However, if Congress wanted to treat Indians as wards of state, then the Secretary should be empowered to analyze each lease to determine whether it conformed to the best interests of the tribes. The court need not decide today what level of administrative discretion is required. It only notes that the two policies underlying the statutes—Indian sovereignty and federal paternalism—are inconsistent and have led to an incoherent and confused state of the law. *See Washington v. Confederated Tribes of the Colville Indian Reservation,* 447 U.S. 134, 176, 100 S.Ct. 2069, 2093, 65 L.Ed.2d 10 (1980).

maintain that the Secretary's decision on the legality of the project under the Assimilative Crimes Act is ripe and should be reversed. Judicial review of the August 6 letter is proper, and the Court affirms the Secretary's decision.

### A. *Ripeness and Finality*

■ The Pueblo withdrew its request for approval in June 1985. The Secretary argues that the Court should therefore not reach the merits of plaintiffs' claim regarding the legality of the dog racing proposal and the Secretary's treatment of that issue in his August 6 letter. He suggests he should be allowed to consider the Pueblo's subsequent modifications to the proposal and also consider the economic feasibility of the project under the April 1986 revised guidelines for review of gambling management contracts. Plaintiffs contend that the August 6 letter indicated an irrevocable view as to the legality of the project on which subsequent events will have no effect. According to their reasoning, resubmission of the proposal for official action would be an empty and fruitless gesture. They argue that they have been, and will continue to be, adversely affected by the Secretary's action and can proceed with the project only after judicial intervention.

The Supreme Court examined the concept of ripeness in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). It established a two-pronged inquiry which requires a court to "evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. at 1515. Our Court of Appeals has further refined the "fitness of the issues" prong of *Abbott* into two questions: whether the dispute presents purely legal questions suitable for judicial review and whether postponement of review to allow for a more concrete or final agency action would benefit the court or the agency. *Better Government Association v. Department of State*, 780 F.2d 86, 92 (D.C.

Cir.1986); *see also Eagle-Picher Industries v. EPA*, 759 F.2d 905, 915 (D.C.Cir.1985).

Under these principles, the Court has little trouble concluding that the Secretary's decision in this case, as expressed in the August 6 letter, is ripe for review. The primary question presented in this proceeding is a purely legal one—that is, the applicability of the Assimilative Crimes Act to the Pueblo's proposed dog racing project. The Secretary's decision on that issue is surely final. He has not indicated any inclination to reconsider his position. Indeed, he reaffirmed the decision in withdrawing approval of the Gila River jai alai project. Since no further developments affecting the project are likely, postponing judicial review of the Secretary's position on the legality of the project would not benefit the Court or the agency. *Cf. Randolph-Sheppard Vendors of America v. Weinberger*, 795 F.2d 90, 105 (D.C.Cir. 1986) (discussing futility exception to exhaustion of administrative remedies requirement).

The hardship to the plaintiffs of postponing judicial review is considerable. The Secretary's statement of his position caused the financial underpinning of the Pueblo's project to collapse. Because of the lack of financing, plaintiffs have been unable to move forward with their project based on their view that Secretarial approval is not required. Moreover, they are now unable to resubmit a viable proposal for the Secretary's consideration. Finally, plaintiffs assert, and the government does not dispute, that they have been advised by the United States Attorney for New Mexico that they are at risk of prosecution under the Assimilative Crimes Act.

■ The ripeness doctrine serves to prevent "piecemeal review" of administrative action. *See Federal Trade Commission v. Standard Oil Co.*, 449 U.S. 232, 242, 101 S.Ct. 488, 494, 66 L.Ed.2d 416 (1980). The Secretary argues correctly that on this record the Court could not properly order the approval of the Pueblo's proposal since the Secretary has not yet evaluated considerations other than its legality.[10] Thus, the

---

10. It should be noted that, contrary to the Secretary's assertion, plaintiffs have never proposed

that the Court order such approval. If Secretarial approval is required, plaintiffs seek only to

plaintiffs' challenge to the August 6 letter does present the possibility of piecemeal review. It was, however, the Secretary himself who chose to articulate a position on the legality of the project with the adverse consequences to the plaintiffs described above. Having made the decision to publicly and definitively state his position, the Secretary cannot now avoid judicial review by claiming that he has not made a final decision on the Pueblo's proposal.[11] The Court holds that the decision expressed in the August 6 letter on the legality of the dog racing project is ripe for review.

### B. *Applicability of the Assimilative Crimes Act* [12]

In the August 6 letter, the Secretary stated that he would not approve the Pueblo's dog racing proposal because in his view it violated the Assimilative Crimes Act. Plaintiffs challenge the Secretary's decision and argue that in reaching his decision the Secretary impermissibly deferred to the opinion of the New Mexico Attorney General.

### 1. *Scope of Review*

Before turning to the applicability of the ACA to the Pueblo's proposal, it is necessary to comment on the scope of the Court's inquiry. The Secretary indicated in his letter that he would not approve the dog racing project because, in his view, it would violate the ACA. Since the ACA is not a statute that the Department of Interior administers, the Secretary's interpretation of that statute does not demand the traditional deference that courts must give agency constructions of ambiguous legislation. *Cf. Chevron U.S.A. v. Natural Resources Defense Council*, 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d

694 (1984). Nor was the Secretary's decision simply an exercise of judgment which Congress has entrusted him to make. The Court must reject the Secretary's view if it is contrary to law. *Securities Exchange Commission v. Chenery Corp.*, 318 U.S. 80, 94, 63 S.Ct. 454, 462, 87 L.Ed. 626 (1943) ("[I]f the action is based upon a determination of law as to which the reviewing authority of the courts does come into play, an order may not stand if the agency has misconceived the law."); *see also Phillips Petroleum Co. v. Federal Energy Regulatory Commission*, 792 F.2d 1165 (D.C.Cir. 1986).

That the Court will take a fresh look at the opposing arguments regarding the applicability of the ACA is significant to one of plaintiffs' major complaints about the handling of their application at the administrative level. The New Mexico Attorney General argued before the Secretary that Pueblo's proposal would violate the ACA. The Secretary stated that the policy of deferring to a state's interpretation of its own criminal law offered grounds for disapproving the project. Plaintiffs argue that such deference is impermissible, and an unlawful delegation of authority, given the Secretary's fiduciary position with respect to Indian tribes. They rely on a recent Ninth Circuit ruling, *Assiniboine and Sioux Tribes of the Fort Peck Indian Reservation v. Board of Oil and Gas Conservation of the State of Montana*, 792 F.2d 782 (9th Cir.1986). In that case, the Bureau of Land Management of the Interior Department required persons seeking drilling permits on Indian trust land to submit applications initially to the State Board for a recommendation. The court held that if the plaintiffs could prove at trial that this arrangement resulted in Bu-

---

prevent the Secretary from relying on what they believe is a mistaken application of the Assimilative Crimes Act in deciding whether to approve the project.

**11.** The August 6 letter also specifically notes the availability of judicial review of the Secretary's evaluation of the applicability of state gambling laws through the Assimilative Crimes Act. Mat. at 446.

**12.** In his cross-motion for summary judgment, the Secretary unfortunately limits his discussion of this issue to a lengthy footnote, choosing to rely heavily on the mistaken argument that his decision was not ripe for review. Nonetheless, since the August 6 letter and the administrative record adequately outline the grounds for the Secretary's interpretation, the Court can proceed to address this issue.

reau "rubberstamping" of State Board, they would have a valid claim of unlawful delegation of authority.

The present case is distinguishable from *Fort Peck* for two reasons. First, in this case, the Secretary did not require the Pueblo to submit its application to the State Attorney General, it simply solicited that official's views on the legality of the project. The Secretary undertook an independent review of the arguments on this issue presented by the Pueblo and the State Attorney General. *See* Mat. at 445–46. Second, as explained above, the Secretary's decision on the applicability of the ACA is subject to *de novo* review by this Court, while the Bureau's dispositions of drilling permit applications could be overturned only if they were arbitrary and capricious. Thus, the delegation of authority in *Fort Peck* had a much more prejudicial effect on the Indians' interests in fair adjudication than did the Secretary's deference in this case.

## 2. *The Merits*
### a. *Application of the Assimilated Crimes Act*

The Assimilative Crimes Act states:

Whoever within or upon any [federal enclave] is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable ... within the jurisdiction of the State ... in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

18 U.S.C. § 13.

Several circuit and district courts have consistently defined Indian lands as federal enclaves and applied the ACA to Indian reservations. *See United States v. Howard*, 654 F.2d 522 (8th Cir.1981), *cert. denied*, 454 U.S. 944, 102 S.Ct. 484, 70 L.Ed.2d 253 (1981); *United States v. Marcyes*, 557 F.2d 1361 (9th Cir.1977); *United States v. Burland*, 441 F.2d 1199 (9th Cir. 1971), *cert. denied*, 404 U.S. 842, 92 S.Ct. 137, 30 L.Ed.2d 77 (1972); *United States v. Sosseur*, 181 F.2d 873 (7th Cir.1950). How-

ever no court has carefully scrutinized whether Congress ever intended that the ACA should be applied to Indian lands.

The only Supreme Court case remotely discussing the issue is *Williams v. United States*, 327 U.S. 711, 66 S.Ct. 778, 90 L.Ed. 962 (1945) (involving a white man charged with raping an Indian girl on the reservation). However, the Court never directly addressed whether the Act should apply to the Indian lands. Instead, the Court presumed that it applied, but then focused its analysis upon the preemptive application of the federal statutory rape law and concluded that the more lenient federal law superseded the state law.

Although *Williams* never scrutinized whether the ACA should apply to Indian lands, the lower courts have consistently cited it as authority for the proposition that the ACA does apply. *Marcyes*, 557 F.2d at 1364 and *Sosseur*, 181 F.2d at 876. Several experts have criticized the courts' application of the Act to the reservations arguing that Congress never originally intended to apply the statute to Indian lands. *See* F. Cohen, *Handbook of Federal Indian Law*, 291 (1982); Clinton, *Indian Criminal Jurisdiction* 18 Ariz.L.Rev. 532 (1976); Newton, *Federal Power Over Indians*, 132 U.Penn.L.Rev. 195 (1982). These critics note that the purpose motivating the enactment of the statute bears little relevance to the native American community. The law was enacted to fill the existing vacuum in the incomplete set of federal criminal laws which governed federal enclaves. *See United States v. Sharpnack*, 355 U.S. 286, 78 S.Ct. 291, 2 L.Ed.2d 282 (1952). In its original version, the Act specifically identified which federal enclaves were governed by the provisions, "forts, dock yard, navy yard, arsenal, armory or magazine." Act of March 3, 1825, 4 Stat. 115. All of these identified areas were military establishments. Although the military had its own separate set of rules, these rules neglected to cover personal actions. Hence Congress saw fit to insure that state laws covered any gaps in the military law. See *Pacific Coast Dairy v. Department of Agriculture of California*, 318 U.S. 285, 63 S.Ct.

628, 87 L.Ed. 761 (1943). The Indians on the other hand, had developed their own comprehensive set of tribal laws. *Fisher v. District Court*, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976). Rather than fill a void, state laws would interfere with the integrated set of existing tribal laws.

Prevailing federal Indian policy, particularly at that time, also discouraged the application of state law to the reservations. "The policy of leaving Indians free from state jurisdiction and control is deeply rooted in the nation's history." *McClanahan v. Ariz. State Tax Comm'n*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973). In 1832, the Supreme Court in *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 8 L.Ed. 483 (1832) held that the Indians were "distinct, independent political communities" and were not subject to state jurisdiction or state laws. In later cases, the Court articulated and refined a doctrine of separate sovereigns acknowledging that "because of local ill feeling, the people of the states where [the Indians] are found are often their deadliest enemies." *United States v. Kagama*, 118 U.S. 375, 382, 6 S.Ct. 1109, 1113, 30 L.Ed. 228 (1886). These early Supreme Court decisions established a controlling doctrine, alive and well today, which places the Indians in a unique sovereign status independent from the states. *3 Affiliated Tribes of the Fort Bethhold*

*Reservation v. Wold Engineering P.C.*, — U.S. —, 106 S.Ct. 2305, 90 L.Ed.2d 881 (1986). This longstanding policy which insulated the Indians from state control, is patently incompatible with the proposition that Congress intended to utilize the ACA to enforce state criminal laws on Indian lands.

■ Despite the historically questionable application of the Act, and the resulting inconsistencies in federal Indian policy, both courts and Congress have continued to apply it to Indian reservations. *See supra* p. 1309. Given the prevailing precedents in three circuits and Congress' silent approval of the developed case law,[13] this Court feels bound to apply the ACA to the Pueblo.[14]

### b. Application of New Mexico Gambling Laws to the Indian Reservation

After reluctantly resolving that the Act applies to the Indian reservations, the Court must conduct a second inquiry to determine whether it authorizes the enforcement of the particular state gambling laws on the reservations. Plaintiffs argue that the Act only authorizes enforcement of state criminal laws on tribal lands. They contend that because New Mexico's laws permit some form of gambling—i.e.

---

**13.** Though Congress' failure to overturn the Court's statutory interpretation is not compelling evidence of its approval, see *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), the Court takes note of the legislatures' failure to object to the courts' interpretation of the ACA over the last 170 years, and its explicit periodic references to the application of the ACA on the reservations in subsequent legislation. *See* Gambling on Indian Reservations and Lands, Hearing on S. 902 by Select Comm. Ind. Affairs (99th Cong., 1st Sess.) (1986).

**14.** The Supreme Court's recent ruling in *California v. Cabazon Band of Mission Indians*, — U.S. —, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) does not alter this conclusion.

Although the Court strongly reaffirmed its support for tribal sovereignty in *Cabazon*, the opinion does not offer an adequate basis for rejecting the longstanding application of the ACA to the Indian reservations. In that case, the Court held that the California laws regulating bingo were regulatory in nature and not

applicable on the Indian Reservations under P.L.280 or the Organized Crime Control Act of 1970. 18 U.S.C. § 1955. The Court had no cause to address the applicability of the ACA to tribal lands. However, it did cite with approval *U.S. v. Marcyes*, 557 F.2d 1361 when noting that lower courts are capable of applying the prohibitory/regulatory distinction. *Id.* at note 10. In *Marcyes*, the Fifth Circuit explicitly ruled that state criminal laws were applicable to the Indian reservations through the ACA. Hence the Supreme Court's favorable reference to the *Marcyes* case indicates its tacit approval of applying the ACA to the reservations.

However, in affirming the importance of tribal sovereignty, the Court stated it would scrutinize whether Congress explicitly provided for the application of state laws on Indian reservations. Its strong support for Indian sovereignty might in the future prompt the Court to overrule *Marcyes*, review the history of the Assimilative Crimes Act and ultimately conclude that Congress never intended to apply the Act to the Indian reservations.

horse racing—all the gambling statutes should be construed as regulatory in nature and unenforceable on the Indian reservation. The Secretary disagrees with plaintiff on two grounds. First he contends that the extension of state jurisdiction incorporates both its criminal and civil laws and automatically bars any form of gambling on Indian lands. Second, defendant argues that even if the Act only encompasses state criminal laws, New Mexico's gambling laws are criminal in nature and would apply to prohibit dog racing on the reservations.

■ This Court agrees with plaintiffs' claim that the ACA only authorizes the enforcement of state criminal laws. Following the analysis of the Supreme Court in *Bryan v. Itasca County*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976), several circuits have established a distinction between criminal/prohibitory and civil/regulatory laws and refused to enforce state regulatory laws on the reservation.[15] *Langley v. Ryder*, 778 F.2d 1092 (5th Cir. 1985); *Barona Group of the Capitan Grande Band v. Duffy*, 694 F.2d 1185 (9th

Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983); *Seminole v. Butterworth*, 658 F.2d 310 (5th Cir.1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *United States v. Farris*, 624 F.2d 890 (9th Cir. 1980), *cert. denied*, 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 839 (1981); *United States v. Marcyes*, 557 F.2d 1361 (9th Cir.1977); *State of Washington v. Hatch*, C–83–1518R (W.D.Wash., Aug. 14, 1984), *appeal dismissed* (9th Cir., Feb. 21, 1985); *Indian Country U.S.A. v. State of Oklahoma*, No. 85–C643–E (N.D.Okla., April 24, 1986); *Mashantucket Pequot Tribe v. McGuigan*, 626 F.Supp. 245 (D.Conn.1986); and *Oneida Tribe of Indians v. Wisconsin*, 518 F.Supp. 712 (W.D.Wisc., 1981). The distinction arose originally under P.L. 280, 25 U.S.C. §§ 1321, 1322,[16] which offered states a mechanism to assume jurisdiction over criminal and civil offenses committed on tribal lands. *See Bryan v. Itasco*, 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710.[17] The Supreme Court in *Bryan* stated:

... nothing in (P.L. 280's) legislative history remotely suggests that Congress

---

**15.** Defendant argues that the prohibitory/criminal, civil/regulatory distinction developed by the Supreme Court to narrow the impact of Public Law 280 should not be extended to the ACA. They point to a recently decided Sixth Circuit case, *United States, et al. v. Dakota, et al.*, 796 F.2d 186 (6th Cir.1986) which ruled that the criminal/prohibitory distinction would not be applied to the Organized Crime Control Act, 18 U.S.C. § 1955 ("OCCA"). However, the Sixth Circuit's ruling is not dispositive of the issue. The decision is in clear disagreement with the Ninth Circuit's opinion in *United States v. Farris*, 624 F.2d 890. The Supreme Court failed to resolve this dispute between the circuits in *California v. Cabazon*, — U.S. at —— n. 10, 107 S.Ct. at 1089 n. 10. Even if this Circuit were to follow the reasoning in *Dakota*, it does not offer persuasive authority for defendants' position. The court in *Dakota* rested its decision on the specific features of the OCCA. The court distinguished OCCA from P.L. 280 by pointing out that OCCA is a federal statute creating a federal crime for a specific set of wrongs—gambling, whereas P.L. 280 was a general jurisdictional statute authorizing state jurisdiction for *all* non-federal crimes. Since Congress saw fit to enact a specific federal statute criminalizing certain types of gambling, the court concluded that the Act should be rigorously enforced on the Indian lands and not diluted by the criminal/prohibitory distinction.

However, the ACA is more akin to P.L. 280. Like P.L. 280, it is purely a jurisdictional statute which applies state laws to federal enclaves. *See infra* n. 21. In contrast to the OCCA which entitles states to enforce only certain gambling laws on the Indian reservation, both P.L. 280 and the ACA entitle the states to enforce all their laws on the Indian reservations. Such broad jurisdictional grants to the states pose much graver threats to Indian sovereignty and must be more narrowly construed. *See Bryan v. Itasca*, 426 U.S. at 378, 96 S.Ct. at 2106.

**16.** The Act was amended in 1968 to require that before a state could assume jurisdiction over the Indian reservation it had to secure the tribe's consent. [82 Stat. 79]. Previously the states could unilaterally extend jurisdiction. Sixteen states exercised their option to assume some measure of jurisdiction over reservation within their borders prior to Congress' amendment. The amendment is further evidence of Congress' dual concern to protect tribal sovereignty and discourage unwanted intervention by the states.

**17.** New Mexico never assumed jurisdiction over the reservation pursuant to P.L. 280. *Chino v. Chino*, 90 N.M. 203, 206, 561 P.2d 476, 479 (1977). Therefore New Mexico laws are applied indirectly under the ACA.

meant the Act's extension of civil jurisdiction to the States should result in the undermining or destruction of such tribal governments as did exist and a conversion of the affected tribes into little more than "private, voluntary organizations," *United States v. Mazurie*, 419 U.S. 544 [95 S.Ct. 710, 42 L.Ed.2d 706] (1975)—a possible result if tribal governments and reservation Indians were subordinated to the full panoply of civil regulatory powers, including taxation, of State and local governments.

*Id.* at 388, 96 S.Ct. at 2110.

The Supreme Court recognized that a broad interpretation of P.L. 280 would undermine the long standing doctrine that Indian tribes were immune from the application of state law activities. *New Mexico v. Mescalero Apache Tribe*, 462 U.S. 324, 103 S.Ct. 2378, 76 L.Ed.2d 611 (1983). Therefore, it narrowly construed the reach of the statute, holding that it did not authorize states to assert civil regulatory powers over the reservations.

Like P.L. 280, nothing in the ACA's legislative history suggests that Congress intended its grant of jurisdiction to the states should result in the destruction of tribal sovereignty. *See, supra* at 1309-10. Therefore, this Court finds that the reasoning in *Bryan* supports application of the civil/criminal distinction to limit the exercise of state jurisdiction under the ACA.[18]

C. *New Mexico Gambling Laws*

In applying the civil/criminal distinction to New Mexico's gambling laws, the Court must determine first, whether the state's provision legalizing horse racing is regulatory in nature. If it is regulatory, then the Court must determine second, whether a provision which permits some types of gambling transforms the entire statutory scheme from a criminal one to a regulatory one. The first point of inquiry is the gambling statutes themselves. New Mexico has adopted a penal code which prohibits all forms of gambling except those expressly enumerated by law. Section 30-19-2 of the New Mexico Annotated Statute makes gambling, defined as "making a bet," § 30-19-2(A), a petty misdemeanor. Commercial gambling, which includes "participating in the earnings of, or operating a gambling place," is a fourth degree felony. § 30-19-3. A bet is defined as a "bargain in which the parties agree that, dependent upon chance ... one stands to win or lose anything of value." § 30-19-2(A). A bet does not include, however, "betting otherwise permitted by law." § 30-19-1(A)(4).

Under this exemption provision, New Mexico has enacted statutory provisions which legalize public horse races. The statute, § 60-1-1, sets out a detailed scheme regulating horse racing. Section 60-1-10 legalizes betting on such races: "Within the enclosure where any horse races are held and where the licensee has been licensed to use the pari-mutuel method or system of wagering on such races, the same shall be lawful but only within the enclosure where such races are held."

On their face, these statutory provisions criminalize all types of gambling except wagering on horse racing. In examining the nature of these enactments, the analysis of other courts that have applied the criminal/prohibitory, civil/regulatory dichotomy is helpful. Courts have consistently held that state laws which regulate the operation of bingo halls are civil/regulatory and should not be applied to govern the operation of bingo halls located on Indian reservations. *Seminole Tribe of Florida v. Butterworth*, 658 F.2d 310 (5th Cir. 1981), *cert. denied*, 455 U.S. 1020, 102 S.Ct. 1717, 72 L.Ed.2d 138 (1982); *Barona Group of the Capitan Grande Band of Mission Indians v. Duffy*, 694 F.2d 1185 (9th Cir.1982), *cert. denied*, 461 U.S. 929, 103 S.Ct. 2091, 77 L.Ed.2d 301 (1983);

---

**18.** The New Mexico Attorney General does not dispute the application of the criminal regulatory test to the ACA. In a memo examining the legality of pari-mutuel betting, an assistant to the Attorney General stated "that the split between civil-regulatory and criminal-prohibitory is the same under Public Law 280 as under the Assimilated Crimes Act seems clear." Memorandum from Bruce Thompson, Assistant Attorney General to Paul Bardacke, Attorney General (Jan. 30, 1968, p. 6 fn. 7).

*Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 518 F.Supp. 712 (W.D.Wisc. 1981). In arriving at their decisions, these courts relied on a modified balancing test assessing state, tribal and federal interests. The courts weighed the strength of the state's public policy against bingo, which each state permitted but strictly regulated, with the tribal interests in protecting their sovereignty and controlling their internal relations, set against a backdrop of the federal interest to encourage tribal self government.

■ After weighing the three interests relative to the instant proceeding, this Court concludes that New Mexico's laws establishing horse racing are regulatory in nature. The state has not evinced a strong policy prohibiting horse racing. Like the states in the bingo cases, New Mexico does not prohibit pari-mutuel betting on horses, and it permits the general public to engage in such betting. The State's own rulings support the conclusion that the state laws permitting pari-mutuel gambling on horse races are regulatory in nature and unenforceable on the reservation. The state's highest court has determined that pari-mutuel betting on horse racing should not be construed as gambling. *Patton v. Fortuna Corp.*, 68 N.M. 40, 357 P.2d 1090 (1960).

In contrast, the Indians' interest in establishing the racing facility is a strong one. The Indians regard the horse racing facility as a means to generate revenue and expand employment opportunities. Under Santa Ana Enterprise's establishing ordinance, all net profits accruing from the facility are to be used exclusively for charitable, educational, religious and scientific purposes on behalf of the Indians. No profits are permitted to inure to the benefit of any individual. The facility will not only generate revenue for the tribe but also provide needed jobs for its members.

Moreover, Santa Ana Enterprise has established a strict scheme for regulating the betting in its facility to exercise strict control over the gambling enterprise. Hence any negative spillover undermining the state's criminal code will be minimal.

Finally the New Mexico Constitution includes a specific section which protects tribal sovereignty and disclaims the state's proprietary interest and control over Indian lands. *Sargre de Cresto Development Corp. v. City of Santa Fe*, 84 N.M. 343, 503 P.2d 323 (1972), *cert. denied*, 411 U.S. 938, 93 S.Ct. 1900, 36 L.Ed.2d 400 (1973). The state's own determination that horse racing is not gambling and hence not criminal, coupled with the state's constitutionally incorporated deference to Indian sovereignty persuade this Court to conclude that the statute regulating betting on horse racing is civil/regulatory in nature.[19]

Plaintiffs' second proposition that the statutory exception which permits pari-mutuel betting on horses should be broadly interpreted to permit pari-mutuel betting on all animal racing on the reservations presents a more difficult question. This Court must turn its attention to whether the statute permitting pari-mutuel betting for horse racing is a narrow exception to New Mexico's otherwise strong public policy against gambling. Plaintiffs argue that it should make little difference whether the racing facility promotes pari-mutuel betting on horse racing or on greyhound racing. Defendant contends the distinction is significant and dispositive.

Plaintiffs' position ignores any inquiry into why the state carefully limited its exception to horse racing. The statute carefully distinguishes the type of gambling activity rather than the structure of the gambling scheme. The Secretary points out that pari-mutuel betting is merely a

19. As discussed earlier, Santa Ana Enterprise amended its contract to permit horse racing as well as greyhound racing on August 15, 1985, nine days *after* the Secretary refused to approve the project. Plaintiff's Doc. 5–2. Plaintiffs have not submitted the proposal for a horse racing facility to the Department of Interior for approval. Since the Secretary has not examined the proposal for a horse racing facility, per se, the Court is not reviewing the legitimacy of this proposal. However, the Court evaluates the State's regulations governing horse racing as part of its inquiry into the nature of New Mexico's provisions on gambling.

process of making a bet[20] which could be used to bet on any sport from athletics to roulette. In the bingo cases discussed earlier, the courts limited their rulings to permit the tribes to operate the specific gambling activity regulated by state statute—bingo. No court ruled that the state's decision to regulate one form of gambling would entitle the tribe to operate any type of gambling facility irrespective of the state's policies resolutely prohibiting such conduct.

As noted, New Mexico laws prohibit almost all forms of gambling. This general prohibition evinces a strong public policy against gambling. The statute regulating horse racing is extremely specific and narrowly drawn. It does not authorize a general exception to the gambling statute for pari-mutuel betting or even for betting on "animal races" as plaintiffs argue. The provision states "the use of the pari-mutuel system shall not be construed to be either betting, gambling or pool selling as authorized under the conditions provided by law." 60–1–10, N.M.S.A. 1978. The New Mexico Supreme Court has construed the horse racing provision as a narrow exception to the general prohibition against gambling. It reads the clause, "under the conditions provided by law" as only permitting betting under the conditions explicitly set forth in the statute. *Schnoor v. Griffin,*

79 N.M. 86, 439 P.2d 922 (1968) (holding that the statute only permits pari-mutuel betting when done by patrons physically present at the track). Certainly New Mexico has the authority to create a narrow exception to its general prohibition against gambling. Several courts have held that states have the power to legalize certain forms of pari-mutuel wagering and continue to criminalize others. *Northwest Greyhound Association v. State of Washington,* 8 Wash.App. 314, 506 P.2d 878 (1973). Other courts have held that statutes legalizing horse races do not create an exemption for dog races as well. *Erlanger Kennel Club v. Daugherty,* 213 Ky. 648, 281 S.W. 826 (1926), *aff'd,* 275 U.S. 509, 48 S.Ct. 158, 72 L.Ed. 398 (1927); *Hawthorne Kennel Club v. Swanson,* 339 Ill. 220, 171 N.E. 140 (1930).

■ It is the state's prerogative to establish exceptions to its criminal code. The state has a strong interest in limiting the types of legalized gambling in order to control potential infiltration by organized crime who are attracted by the lucrative opportunities offered by gambling enterprises. Though the Indians' competing interest to generate revenue is a strong one, no court has permitted a tribe to operate a commercial enterprise generally prohibited by the applicable state law.[21] New Mexi-

**20.** Pari-mutuel betting is a form of betting on competitors where a pool of money is divided among the winners after the management withdraws a share from the overall purse.

**21.** Plaintiffs argue that two recent cases in the Supreme Court, *Kerr v. McGee,* 471 U.S. 195, 105 S.Ct. 1900, 85 L.Ed.2d 200 (1985) and *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 137, 102 S.Ct. 894, 901, 71 L.Ed.2d 21 (1982), should be broadly interpreted to grant tribes plenary authority to use any means to finance essential tribal services regardless of opposing state laws. However, neither case grants the tribes the power to tax in violation of state laws. Taxing a good which is independently and legitimately circulating in the nation's market is fundamentally different from actually establishing an operation to generate revenues which violates the state's laws. *See Penobscot Nation v. Stilphen,* 461 A.2d 478 (Me.1983). The Court recognizes that state regulated gambling has become a growing alternative form of taxation providing money for essential state services. Moreover the Indians have no viable tax base and a weak

economic infrastructure. Therefore they, even more than the states, need to develop creative ways to generate revenue. However, the tribe's need for resources does not permit this Court to ignore the states' rights to define and enforce its criminal code.

Moreover the federal interests run counter to promoting pari-mutuel wagering on Indian reservations. In stark contrast to the federal government's explicit encouragement for the development of bingo facilities, *see Cabazon,* —— U.S. at ——, 107 S.Ct. at 1090–93, the government disapproves or is at best neutral toward the development of pari-mutuel wagering facilities on Indian reservations. Congress has been considering federal legislation to regulate gambling on the Indian reservations. Under each of the three bills proposed in 1986, pari-mutuel wagering was either prohibited entirely or required state approval and would be regulated according to state laws. *See* S. 902, H.R. 1920 or SXXX discussed in Hearings on Indian Gambling Act, Select Committee on Ind. Affairs, 99th Cong., 2d Sess. June 17, 1986. Congress' efforts

co's limited exception should not be construed to swallow its general prohibition against gambling and convert the criminal policy into a regulatory one. Since the statute only authorizes a specific exception for pari-mutuel bets on horse racing, pari-mutuel betting on greyhound racing must be analyzed under the states general criminal laws prohibiting gambling. 30–19–(1–3).

The New Mexico gambling provision is a general prohibition. The statute clearly prohibits betting. It is part of the state's criminal code and provides for criminal penalties. Hence the states' prohibition against dog racing would preclude the Indians from establishing a greyhound racing facility.

## CONCLUSION

Under current law, New Mexico criminal laws prohibiting gambling apply to the Indian lands. The plaintiffs' proposal to build a greyhound racing facility runs afoul of the New Mexico law. The Secretary of Interior properly denied the Pueblo of Santa Ana's and the Santa Ana Enterprise's request to develop a dog racing facility. His decision is affirmed and the complaint seeking judicial intervention is dismissed.

An appropriate order will be entered.

## ORDER

In accordance with the **Memorandum Opinion** entered on this day, it is this 1st day of May, 1987,

## ORDERED

That the motion for summary judgment by the defendant, the Secretary, Department of Interior, is granted.

That the motion for summary judgment by the plaintiff, Pueblo of Santa Ana, is denied; the plaintiffs' complaint is dismissed with prejudice.

illustrate its refusal to forego legitimate state interests, and instead strike an appropriate balance between the Indians' needs to generate revenue and the states' interests to deter potential criminal enterprises.