DANIEL G. SMITH, Administrator Income, Sales, Inheritance andExcise Tax Division Department of Revenue
You requested my opinion as to what lands are includable as Indian "reservations" for purposes of 68 Op. Att'y Gen. 151 (1979), and for other tax administration purposes. In 68 Op. Att'y Gen. 151 *Page 83 
(1979), I noted that the United States Supreme Court has made clear that a general exemption from state taxes extends to Indian tribes and Indian persons within reservation boundaries. Where the burden of the tax sought to be imposed is on an Indian person or Indian tribe located within reservation boundaries, such tax cannot be lawfully imposed.
On November 24, 1976, the Department of Revenue issued guidelines relating to the taxation of Indians in Wisconsin. In that memorandum. "reservation" is defined to mean "all land within the boundaries of the Bad River, Forest County Potawatomi, Lac Courte Oreilles, Lac du Flambeau, Mole Lake, Oneida, Red Cliff, St. Croix, and Stockbridge — Munsee reservations and Winnebago Indian Communities." For the reasons that follow, it is my opinion that the definition utilized by your department since November 24, 1976, is legally correct. You note, however, that from time to time additional land outside treaty defined reservations has been acquired by the federal government for the use of an Indian tribe. Your principal concern now is the status of such lands.
You are correct in noting that many reservations were established pursuant to treaties negotiated with the tribes. Other reservations, however, were established by executive order or pursuant to special federal legislation.
In return for ceding their vast landholdings to the United States, many tribes were allowed to "reserve" a smaller portion of their lands for their permanent residence. These "reserved lands" were the foundation of the American reservation system. The federal government stopped making treaties with the Indians in 1871 — reservations were established after this date only by executive order or legislation. Regardless of how land came to be reserved for Indian use by the federal government, the legal status of such reserved land is the same. (See, e.g.,Donnelly v. United States, 228 U.S. 243, 269 (1913)).
As the Court stated in Minnesota v. Hitchcock, 185 U.S. 373,390 (1902), "in order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes." In commenting *Page 84 
further on the origin of reservations, the Court quoted with approval from Spalding v. Chandler, 160 U.S. 394, 403-04 (1896):
 It is not necessary to determine how the reservation of the particular tract subsequently known as the "Indian Reserve" came to be made. It is clearly inferable from the evidence contained in the record that at the time of the making of the treaty of June 16, 1820, the Chippewa tribe of Indians were in the actual occupation and use of this Indian reserve as an encampment for the pursuit of fishing . . . .
 But whether the Indians simply continued to encamp where they had been accustomed to prior to making of the treaty of 1820, whether a selection of the tract afterwards known as the Indian reserve was made by the Indians subsequent to the making of the treaty and acquiesced in by the United States government, or whether the selection was made by the government and acquiesced in by the Indians, is immaterial . . . . If the reservation was free from objection by the government, it was as effectual as though the particular tract to be used was specifically designated by boundaries in the treaty itself. The reservation thus created stood precisely in the same category as other Indian reservations, whether established for general or limited uses, and whether made by the direct authority of Congress in the ratification of a treaty or indirectly through the medium of a duly authorized executive officer.
In United States v. Pelican, 232 U.S. 442 (1914), the Court considered whether the allotment of land to individual tribe members which originally had been reserved for the tribe's use removed that land from reservation status. The Court concluded,Pelican, at 449-50:
 In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the Government. . . . The same considerations. in substance, apply to the allotted lands . . . . The allottees were permitted to enjoy a more secure tenure and provision was made for their ultimate ownership without restrictions. But, meanwhile, the lands remained Indian lands set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they *Page 85 
became other than Indian country through the distribution into rate holdings, the government retaining control.
 . . . Nor does the territorial jurisdiction of the United States depend upon the size of the particular areas which are held for Federal purposes. . . . It must be remembered that the fundamental consideration is the protection of a dependent people.
The controlling consideration, therefore, is whether the land has been validly set apart for the use of the Indians under the superintendence of the government. See, United States v. McGowan,302 U.S. 535, 538 (1938); and United States v. John, 437 U.S. 634
(1978).
In McGowan, the Court considered whether the Reno Indian Colony, composed of several hundred Indians residing on a tract of 28.38 acres of land owned by the United States, had the same "Indian country" status as other reservations. The Court concluded, McGowan, at 538-39:
 Indians in this colony have been afforded the same protection by the government as that given Indians in other settlements known as "reservations." Congress alone has the right to determine the manner in which this country's guardianship over the Indians shall be carried out, and it is immaterial whether Congress designates a settlement as a "reservation" or "colony."
It also appears to make no difference whether the land in question is held in trust by the United States for the use of an Indian tribe or an individual tribe member, as with allotments, or whether the tribe holds the fee title to the land. In UnitedStates v. Sandoval, 231 U.S. 28 (1913), the Court considered whether land owned in fee by various Pueblos in New Mexico was Indian country. The Court found controlling the unique relationship between the United States and the Pueblos that was essentially the same as the relationship between the United States and other Indian tribes residing on land held in trust by the United States. The Court also noted that the Pueblo lands were essentially the same in character as the lands owned in fee by the five civilized tribes which the courts earlier held subject to congressional legislation enacted in the exercise of the government's guardianship over these tribes and their affairs. Sandoval, at 48. *Page 86 
Felix S. Cohen, Handbook of Federal Indian Law (1941), summarizes the evolution of the use of the terms "Indian country" and "Indian reservation." He notes that in early federal legislation, the terms "Indian country" and "Indian territory" were used synonymously. As new states were carved out of what had been generally referred to at one time as the Indian territory with some of the land within their borders reserved for Indian use, the concept of Indian reservations was developed. Cohen notes that the court and Congress considered these reserved lands to be in the same status as Indian country and Indian territory. (See generally, at 6 and 206.)
In 68 Op. Att'y Gen. 151 (1979), several Supreme Court decisions involving state authority to impose taxes on Indian tribes within reservation boundaries were reviewed. In the leading case on cigarette taxes involving sales by Indians within reservation boundaries, Moe v. Salish Kootenai Tribes, 425 U.S. 463
(1976), the Court made clear that for purposes of taxation jurisdiction, all lands located within the exterior boundaries of an Indian reservation would be treated the same. The Court did not distinguish between land located within the reservation which remained in trust status, either for the tribe or individual tribe members, and land that had been alienated and is now owned in fee by Indians or non-Indians. The court refused to distinguish between fee and trust lands because it considered "checkerboard jurisdiction" within reservation boundaries to be unworkable.
Referring to Montana's argument that the General Allotment Act of 1887, 24 Stats. 388, enhanced the state's taxing power over fee lands within a reservation, the Court said:
 If the General Allotment Act itself establishes Montana's jurisdiction as to those Indians living on "fee patented" lands, then for all jurisdictional purposes — civil and criminal — the Flathead Reservation has been substantially diminished in size. A similar claim was made by the State in Seymour v. Superintendent, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962), to which we responded:
 "[The] argument rests upon the fact that where the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement *Page 87 
officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government." Id., at 358
. . . .
Moe, 425 U.S. at 478.
With this overview of the legal principles that define Indian reservations in mind, your specific questions will be considered. You note that "Indian land" may be grouped into the following four categories:
 1. Land held in trust by the United States of America for the tribe.
 2. Land held in trust by the United States of America for individual Indians.
3. Land owned by the tribe in fee simple.
4. Land owned by individual Indians in fee simple.
You cite three specific examples. First, land purchased by the St. Croix Tribal Council in the Town of Swiss (Danbury), Burnett County, which has been deeded to the United States of America to be held in trust for the St. Croix Band of Lake Superior Chippewa. Second, land recently purchased by the United States of America in the Town of Delton, Sauk County, in trust for the Winnebago Tribe. And finally, the transfer on May 18, 1973. of five acres in Monroe County to the United States of America in trust for a member of the Winnebago Tribe. You note that "[i]n each of the three examples cited above, untaxed cigarettes are being or have been sold. In the Danbury example, Indians are operating a General Store and advertising that sales are not subject to Wisconsin sales tax." You ask:
 1. Are the above examples of real estate "Indian reservations" for purposes of applying OAG 56-79?
Neither the St. Croix nor the Winnebago occupy a reservation in the traditional sense of a compact block of lands specifically reserved for tribal use with clearly marked exterior boundaries. The St. Croix *Page 88 
Band's territory is comprised of a combination of dependent Indian communities and noncontiguous tracts of land held in trust by the United States of America for the St. Croix Band which are located in several counties in the northwest part of Wisconsin. The Winnebago Tribe's territory is also comprised of a combination of dependent Indian communities, some of which are located on tracts of land held in trust for the Winnebago Tribe by the United States of America. and individual Indian allotments throughout southern Wisconsin.
Although the lands in your examples were only recently purchased and placed into trust with the federal government, it is clear that the Secretary of the Interior has the authority to purchase lands or accept lands into trust for the use of Indian tribes at any time. The primary statutory authority is the 1934 Indian Reorganization Act (48 Stat. 984, 25 U.S.C. sec. 461, etseq.). This Act provided a statutory basis for the reestablishment of Indian reservations and the reorganization of Indian tribes as governmental entities. Specifically, it gave the Secretary of the Interior authority to purchase lands for the purpose of providing an expanded land base for Indian tribes on existing reservations (25 U.S.C. sec. 465), and to proclaim new Indian reservations where none existed previously (25 U.S.C. sec. 467).
As indicated, the controlling consideration is whether land purchased by the Secretary of the Interior or accepted into trust by the Secretary of Interior, pursuant to the Indian Reorganization Act or other legal authority, has been validly set apart for the use of the Indians as such, under the superintendence of the United States Government. See John,437 U.S. at 649.
It is my opinion that since the lands that you refer to in the Town of Swiss (St. Croix Band) and the Town of Delton (Winnebago Tribe) were placed into trust for the use of the respective tribes and are no doubt under the general superintendence of the Department of Interior, Bureau of Indian Affairs, those lands qualify as "reservation land."
It is less clear, however, whether the parcel of land in Monroe County, which was transferred into trust for the benefit of an individual Winnebago Indian, constitutes reservation land as the term has been defined and utilized in the more recent United States Supreme Court decisions referred to herein and in 68 Op. Att'y Gen. *Page 89 
151 (1979). There is, however, ample precedent to conclude that, where the federal government secures land, by whatever means, for the use of an individual tribe member, and that land remains under the superintendence of the government, it constitutes reservation land with substantially the same jurisdictional status as any other reservation land in the state. That jurisdictional status may be modified, if certain state interests have vested in recently purchased parcels located outside established reservations. The critical element would be available evidence of the federal government's intention to divest or not divest the state of its vested interests. Another factor would be the extent of federal superintendence over the land and activities conducted on it. Because of such factors, the tribe member may or may not, depending on the intent of the government at the time the land was placed into trust status, have the same rights to utilize the land as are attached to lands that were reserved for Indian tribes in treaties or as a result of special legislative enactments. Thus, the tribe member may or may not have acquired hunting and fishing rights on such land free of state regulation. See, e.g., State v. Shepard, 239 Wis. 345,300 N.W. 905 (1941) and Sac Fox Tribe of Mississippi in Iowa v.Licklider, 576 F.2d 145 (8th Cir. 1978). Such land, however, would clearly be treated the same as trust land located within reservation boundaries for some purposes. For example, the land itself would not be taxable by state and local units of government.
The determination of whether such land must be treated the same as other reservation land for a specific jurisdictional purpose depends in significant part on the intent of the federal government when the land was placed into trust and on the extent of federal superintendence over the land and activities conducted thereon. Since such determination involves questions of fact, it must await resolution in an appropriate case where all facts can be considered. Based on the information you have provided. it is not possible to determine whether such land in fact qualifies as reservation land.
You also ask:
 2. For purposes of administering Wisconsin's cigarette tax laws, does the Department of Revenue have different jurisdiction on an Indian reservation than it does on: *Page 90 
 a. Land held in trust by the United States of America for the tribe?
 b. Land held in trust by the United States of America for individual Indians'?
c. Land owned by the tribe in fee simple?
d. Land owned by individual Indians in fee simple?
In my opinion, the Department of Revenue has the same jurisdiction on Indian reservations established by treaty as it does on land held in trust (i.e., reserved) by the United States for the use of Indian tribes regardless of how or when that land was acquired. As indicated, it is less clear what the jurisdictional relationship is with respect to land held in trust for individual Indians if such lands have only recently been acquired and are located outside exterior boundaries of reservations that were established by treaty, executive order, or special legislative enactments.
Unfortunately, I do not have enough information about the reservation of the Monroe County parcel to decide whether the state can tax cigarette sales to non-Indians on that parcel. I would be glad to consider the question again if you can provide additional facts about the land, its reservation by the federal government, and activities on it.
Recent Supreme Court cases such as Mattz v. Arnett, 412 U.S. 481
(1973) and Seymour v. Superintendent, 368 U.S. 351 (1962), clearly establish the principle that once a reservation has been established, all land, regardless of tenure, remains part of that reservation unless specifically removed therefrom by clear congressional action. Therefore, land owned in fee by the tribe or individual tribe members retains its reservation status if located within existing reservation boundaries or if the federal government has recognized it as such. If such land, however, is located outside recognized reservation boundaries, that land would not be considered reservation land and the Department would have jurisdiction over such land to the same extent it enjoys jurisdiction over any other fee land located within the state.
You ask: *Page 91 
 3. For purposes of administering Wisconsin's sales tax laws, does the Department of Revenue have different jurisdiction on an Indian reservation than it does on:
 a. Land held in trust by the United States of America for the tribe?
 b. Land held in trust by the United States of America for individual Indians?
c. Land owned by the tribe in fee simple?
d. Land owned by individual Indians in fee simple?
Again, depending on where the land in question is located, the determining consideration is its status as reservation land or nonreservation land. The Department's jurisdiction is affected accordingly. In the Department's November 24, 1976 guidelines, jurisdiction to collect sales and use tax against Indians on and off reservations is summarized. In view of the Supreme Court's decision in Moe, it is my opinion that the Department's summary is correct. That is, sales and deliveries to Indians on reservations are exempt but sales to non-Indians on reservations are subject to the state sales and use tax.
You ask:
 4. Do Mescalero Apache Tribe v. Jones, 411 US 145
(1973), and Matheson v. Kinnear, 393 F. Supp. 1025
(1975), permit the Department of Revenue to require Indians doing business on land as described in a, b, c or d, above, to collect and pay Wisconsin's cigarette tax and sales tax on:
a. Sales made to Indians who are tribal members?
b. Sales made to Indians who are not members of that tribe?
c. Sales made to non-Indians?
For the reasons already stated, such sales made to tribe members are not subject to the cigarette and sales tax, provided the sale or the delivery occurs on reservation land. Such sales made to Indians who *Page 92 
are not members of that tribe or to non-Indians would be subject to the state sales and use tax. See Moe. All sales made on nonreservation land would, of course, be subject to all such taxes.
BCL:JDN