THOMAS LOFTUS, Chairperson Assembly Organization Committee
As Chairperson of the Assembly Committee on Organization you have requested an opinion concerning the effects of the Wisconsin constitutional amendment, which allows the state Legislature to authorize a state-operated lottery and pari-mutuel betting, on state jurisdiction over Indian gambling activities on Indian reservations in Wisconsin. The amendment to Wis. Const. art. IV, § 24 (5) provides in pertinent part:
 This section shall not prohibit pari-mutuel on-track betting as provided by law. The state may not own or operate any facility or enterprise for pari-mutuel betting, or lease any state-owned land to any other owner or operator for such purposes.
 The Legislature may authorize the creation of a lottery to be operated by the state as provided by law. . . .
This amending language is not self-executing. On November 25, 1987, the Governor signed legislation authorizing the creation of a lottery to be operated by the state. 1987 Wisconsin Act 119. Legislation which will authorize on-track pari-mutuel betting is still pending in the Legislature.
You have requested a formal opinion on certain specific questions listed in a letter to me from Representative John L. Merkt which I generally addressed in my reply dated March 25, 1987. Those questions focused on the concern that Indians may be able to conduct pari-mutuel games and lotteries in any manner they choose because gambling on Indian reservations may not be subject to regulation by the state.
SUMMARY OF MERKT QUESTIONS:
Following is a summary of the questions presented in Representative Merkt's letter. In general, these questions consider whether or *Page 25 
not gambling activities on Indian reservations will be subject to state regulatory and criminal laws.
What may Indians do on Indian-controlled territory?
1. Conduct any form of lottery or hire any operators? (Perhaps.)
 E.g. Lotteries based on other sports events like baseball, football or basketball games? (No.)
2. Sell lottery tickets from other states? (No.)
3. Site a dog track? (Yes.)
4. Site a horse track? (Yes.)
5. Open off-track gambling parlors? (No.)
What may the state do to oversee gambling on Indian-controlled territory?
1. Regulate advertisement on and off the reservation? (Only off reservation.)
2. Prohibit gambling by minors? (Yes.)
3. Audit or oversee activities by the state gambling commission? (No.)
4. Conduct background checks of individuals running Indian gambling operations? (Yes, but only if requested by the tribe.)
SUMMARY OF ANALYSIS:
In Wisconsin, state laws generally are not enforceable against Indians within Indian country[1] if they merely regulate an activity, but they are enforceable if they prohibit an activity altogether. Because Wisconsin now allows some specific forms of gambling, it is likely that the courts will find that laws which authorize and govern these specific forms of gambling are regulatory. As regulatory laws they will not apply to Indian gambling activities on *Page 26 
reservations because the courts have found that tribal and federal economic interests in on-reservation gaming far outweigh any competing state interest. Laws which prohibit a specific form of gambling entirely would, in my opinion, continue to apply on reservations.
69 Op. Att'y Gen. 22 (1980) (an opinion primarily concerned with the operation of bingo on Indian reservations) and, more recently, 72 Op. Att'y Gen. 182 (1983), concluded that the state's criminal statutes which prohibit a specific gambling activity are enforceable against Indians under the authority granted by Pub.L. No. 280 (67 Stat. 588, 28 U.S.C. § 1360,18 U.S.C. § 1162 (1984)). Under this statute, the state acquired limited civil and general criminal jurisdiction over Indians in "all Indian country within the state except the Menominee Reservation." I agree with the conclusions in those opinions that as long as a specific gambling activity is generally proscribed under state law, those laws are enforceable against Indians subject to Pub.L. No. 280 within Indian country. Since Wisconsin lacks jurisdiction under Pub.L. No. 280 on the Menominee Reservation, federal law incorporates by reference state laws that proscribe such activity. Those laws are enforceable by the federal government. See United States v.Sosseur, 181 F.2d 873 (7th Cir. 1950); United States v. Farris,624 F.2d 890 (9th Cir. 1980).
 STATE GAMING JURISDICTION WITHIN INDIAN RESERVATIONS.
A. Underlying Indian Law Principles.
Following a similar constitutional amendment and legislative enactments decriminalizing the operation of bingo and raffles, the courts determined that the state was without regulatory jurisdiction over bingo games conducted by Indians within reservation boundaries. Oneida Tribe of Indians of Wis. v. Stateof Wisconsin, 518 F. Supp. 712 (W.D. Wis. 1981); Lac du FlambeauBand v. Williquette, 629 F. Supp. 689 (W.D. Wis. 1986) The United States Supreme Court affirmed the reasoning used in those cases in California v. Cabazon Band of Mission Indians, 480 U.S. 202
(1987). In Cabazon, the Court laid out the guidelines for determining whether or not state gambling laws apply to Indians within Indian country. California and its political subdivision, Riverside County, had sought to apply to the tribes state law governing the operation of bingo *Page 27 
games and local ordinances prohibiting the playing of draw poker and other card games. The Court held that state laws may be applied to Indians on their reservations if Congress has expressly consented. The Court concluded that Congress did not consent to California enforcing its gambling laws either by Pub.L. No. 280 or by the Organized Crime Control Act of 1970 (84 Stat. 937, 18 U.S.C.A. § 1955 (1984)). Because the gambling activities in question did not violate California public policy, they were considered regulatory rather than prohibitory.
The Court did hold, however, that, absent express congressional consent, state and local regulatory laws may nevertheless be applied to on-reservation activities of tribes and tribe members but only in exceptional circumstances. Id. 480 U.S. at 215. The Court found no such circumstances surrounding gambling on Indian reservations in California.
1. Public Law No. 280.
The Cabazon Court held that state laws will automatically apply on Indian reservations in states coming under Pub.L. No. 280 only if they are criminal/prohibitory. Although Pub.L. No. 280 does not mention "prohibitory laws," the Cabazon court held that not all laws which provide for criminal sanctions are included under its coverage. To fall under Pub.L. No. 280 and apply on Indian reservations a law must totally prohibit the public from engaging in a specific activity. In its final analysis, the Court applied the "shorthand test" of whether the specific activities in question were against public policy and found that gambling in the form of bingo and card games is not against public policy in California. This meant that state laws simply regulated these activities and therefore they were not enforceable on reservations under Pub.L. No. 280.
In all cases in federal court involving bingo the state laws have been found to be regulatory, not criminal MashantucketPequot Tribe v. McGuigan, 626 F. Supp. 245 (D. Conn. 1986);Langley v. Ryder, 778 F.2d 1092 (5th Cir. 1985); Barona Group ofCapitan Grande Band, Etc., v. Duffy, 694 F.2d 1185 (9th Cir. 1982); Seminole Tribe of Florida v. Butterworth, 658 F.2d 310
(5th Cir. 1981); Oneida Tribe of Indians of Wis. v. State ofWisconsin, 518 F. Supp. 712 (W.D. Wis. 1981). Where the general public is not totally prohibited from playing a game like bingo, laws regarding how such gambling activity is to be conducted and played are deemed *Page 28 
regulatory/civil. In my opinion, analogous gambling activities generally allowed within the state would effect the same legal conclusion.
 2. Preemption or infringement will bar the exercise of state regulatory jurisdiction.
Contemporary United States Supreme Court decisions make clear that the state is not absolutely prohibited from exercising regulatory jurisdiction over Indian tribes and tribe members.Cabazon, 480 U.S. at 214-15; White Mountain Apache Tribe v.Bracker, 448 U.S. 136, 141 (1980); County of Vilas v. Chapman,122 Wis.2d 211, 214, 361 N.W.2d 699 (1985); State v. Webster,114 Wis.2d 418, 432, 338 N.W.2d 474 (1983). In Rice v. Rehner,463 U.S. 713 (1983), the Court articulated the principles that must be met before state regulatory jurisdiction over Indians within reservation boundaries is allowable.
The Cabazon Court noted that it is only in exceptional circumstances that these principles can be met, thereby allowing a state to assert jurisdiction over the on-reservation activities of tribe members. 480 U.S. at 215.
There exist "two independent but related barriers" to state jurisdiction: federal preemption of state authority and infringement of the tribal right to self-government. Rice,463 U.S. at 718-19 (citing Bracker, 448 U.S. at 142); Chapman,122 Wis.2d at 214; Webster, 114 Wis.2d at 432. The emphasis in applying this test, commonly referred to as the "Rice Test," is on federal preemption, which analysis is informed by considerations of tribal sovereignty. Rice, 463 U.S. at 718;Chapman, 122 Wis.2d at 214; Webster, 114 Wis.2d at 433.
Federal preemption is determined by a two-pronged analysis. First, one must assess the "backdrop" of tribal sovereignty by determining whether the tribe has a tradition of self-government in the subject area sought to be regulated and by balancing the state, federal and tribal interests involved. Against this backdrop, one can then determine whether the federal government has preempted the state's exercise of jurisdiction. Rice,463 U.S. at 719-20; Webster, 114 Wis.2d at 434-36. There may be preemption in Indian law even though there is no congressional action explicitly precluding the assertion of state authority.Rice, 463 U.S. at 719; New Mexico v. Mescalero Apache Tribe,462 U.S. 324, 334 (1983). *Page 29 
Under the Rice test, state civil/regulatory laws concerning Indian activity within Indian country are preempted by federal authority if the federal and tribal interests outweigh the state interests. In general, the federal and tribal interests in Indian self-sufficiency and sovereignty will outweigh any state interests. Gambling enterprises can be a life-saving source of income for Indian tribes. Tribes are using such revenues increasingly to fund local government and welfare programs and provide employment. In Cabazon, the Court found that these interests far outweighed the state's interest in guarding against infiltration of gambling by organized crime.
When preemption is not found, it is necessary to consider the second and independent barrier of state infringement on the tribal right of self-government. "Although self-government is related to federal preemption in the sense that preemption is considered in the context of the deeply ingrained traditional notions of self-government, the self-government doctrine is an independent barrier to state regulation." Crow Tribe of Indiansv. Montana, 650 F.2d 1104, 1110 (9th Cir. 1981), cert. denied,459 U.S. 916 (1982). See also, Bracker, 448 U.S. at 143.
3. Principles governing other jurisdictional issues.
In addition to the prohibitory/regulatory problem and federal preemption and infringement considerations, there may be jurisdictional concerns depending on who violates the state's criminal prohibitory laws. For Pub.L. No. 280 areas (all of the state except for the Menominee Reservation), the state clearly has jurisdiction over anyone who commits a criminal offense. On the Menominee Reservation, the situation is more complex.
If an Indian violates any federal or state criminal law while on the Menominee Reservation, the federal government has exclusive jurisdiction through the Major Crimes Act,18 U.S.C.A. § 1153 (1984), General Crimes Act, 18 U.S.C.A. § 1152
(1984), and Assimilative Crimes Act, 18 U.S.C.A. § 13 (1969), with one important exception. If the activity was between Indians only and was not a major crime, the federal government will not have jurisdiction if the tribe has already punished the offender. Major crimes are those listed in 18 U.S.C.A. § 1153 (1984), and they do not include any gambling related crimes. This may be important for gambling laws, which do not always have clear "victims." *Page 30 
If a non-Indian commits a crime that only involves a non-Indian on the Menominee Reservation, the state has exclusive jurisdiction.
If a non-Indian commits a crime that involves an Indian on the Menominee Reservation, the federal government has jurisdiction. The state might also have concurrent jurisdiction over crimes committed by non-Indians against Indians, but the law is unclear on this point. Dicta in several cases suggests that the federal government has exclusive jurisdiction over "inter-racial" crimes, but these statements all come from cases where an Indian commits a crime against a non-Indian. This is another situation where the exact definition of the crime could make a difference. If the crime has no victim and is committed by a non-Indian, then the state rather than the federal government may have jurisdiction.
Finally, the federal government has jurisdiction over anyone violating a federal law. For example, current federal law prohibits slot machines on reservations. 15 U.S.C.A. § 1175
(1982). The Organized Crime Control Act may also relate to gambling activities operated in violation of state law over which violations the federal government would have exclusive jurisdiction. Compare United States v. Farris, 624 F.2d 890 (9th Cir. 1980), cert. denied, 449 U.S. 1111 (1981) and Barona Groupof Capitan Grande Band of Mission Indians, San Diego County, Cal.v. Duffy, 694 F.2d 1185 (9th Cir. 1982) with United States v.Dakota, 796 F.2d 186 (6th Cir. 1986).
II. GAMBLING ACTIVITIES INDIANS CAN ENGAGE IN WITHIN THEIR RESERVATIONS FREE OF STATE LAW.
 A. Lotteries And Wisconsin Policy Concerning Related Forms of Gambling.
The California experience, considered in Cabazon, is illustrative. The Cabazon decision was based in large part on the court's conclusion that California's general attitude toward gambling is not prohibitive. California itself runs and advertises a gambling operation (a lottery). In addition, other forms of gambling are allowed, such as bingo, raffles, pari-mutuel betting and certain card games, such as draw poker and lowball. These factors were sufficient to allow the court to conclude that in California gambling per se was not against public policy. To the contrary, gambling was generally allowed with only a few restrictions. Wisconsin, like California, has dramatically altered public policy concerning gambling with the *Page 31 
most recent constitutional amendment and with the enactment of the lottery legislation.
Although once generally prohibited, Wisconsin has been moving toward increasing acceptance of gambling. The constitutional prohibition against all lotteries was amended to allow bingo and raffles. The most recent amendment allowing a state-operated lottery and pari-mutuel on-track betting shows a trend not unlike the California experience toward increased public acceptance of these forms of gambling.
Section 945.01 (5)(am), Stats., provides: "`Lottery' does not include bingo or a raffle as defined in s. 163.03 if conducted under ch. 163 or the state operated lottery as conducted under ch. 565." The current definitions in section 945.01 of lottery and betting do not clearly distinguish particular types of games. Lottery is broadly defined as any enterprise involving prize, chance and consideration. A bet is simply a "bargain in which the parties agree that, dependent upon chance even though accompanied by some skill, one stands to win or lose something of value specified in the agreement." Each of these definitions exempts activities (in addition to bingo, raffles and the state operated lottery) which would otherwise fit into the definition, such as business transactions, insurance policies, and prizes for contests. Once the amendment is fully implemented, the public generally will no longer be prohibited from placing bets on authorized lottery games or participating in on-track pari-mutuel betting.
Chapter 565 does not define the types of lottery games the state may offer. Section 565.27 (1) does provide that "no game may be offered for which winners are selected based on the results of a race or sporting event." Considered together, these provisions empower the lottery board to conduct any type of lottery except ones based on the results of a race or sporting event. and permits persons in this state generally to participate in such gambling activities. This statutory scheme, in my opinion, effectively decriminalizes lotteries in the same manner that bingo and raffles were decriminalized in earlier legislation. As such, lotteries, like bingo, clearly are now a regulated form of gambling. It is my opinion that in view ofCabazon, the courts likely will find tribally conducted lotteries in whatever form beyond the reach of Wisconsin regulatory law. *Page 32 
Indian tribes probably will not be able to sell lottery tickets from other states. Federal laws prohibit transfer or sale of tickets across state lines. Title 18, ch. 61 — Lotteries, section 1301-07. Some states do have multi-state lotteries which are legal, provided the lottery retains the "state-run" nature. If the courts determine that the federal laws do not apply, it may be very difficult for the state to establish a basis for its policy against such sales, which would mean that the state could not stop the sale of these tickets by Indians on Indian reservations because the "general activity" of playing a lottery is no longer prohibited.
B. Pari-mutuel Betting.
The constitutional amendment does not specify the types of events for which the Legislature is allowed to authorize pari-mutuel betting. It merely states "as provided by law." The Legislature is empowered to authorize not only pari-mutuel betting on horse and dog races but also, as the LRB bulletin notes, under the amendment even pig racing may be allowed.
Arguably, tribes may be free to construct any type of track for any type of race regardless of the state statutory scheme. Pari-mutuel betting is not by definition now limited to a specific event such as horse racing. In my opinion, as a matter of public policy, the amendment lifted the ban on all lotteries and pari-mutuel betting, and later legislative limits on what types of events will be permitted is mere regulation. Under the Wisconsin Constitution, members of the general public are no longer prohibited from pooling their money and getting a portion of the total if they bet on the right outcome. If the legislative scheme enacted tracks the lottery legislation, the determination of what events they can bet on will likely be considered by the courts a matter of state regulation.
Carefully drafted legislation prohibiting pari-mutuel betting on specific events may preclude expanded tribal activity in this regard. One district court agreed with an analogous argument by New Mexico in a May 1987 case involving dog racing on an Indian reservation. Pueblo of Santa Ana, et al. v. Hodel, 663 F. Supp. 1300
(D.C. D.C. 1987). Under New Mexico law, the only pari-mutuel betting allowed was on horse races. The tribe wanted to establish pari-mutuel betting on dog races. The court held that state authorization of pari-mutuel betting on horse racing did not affect public policy against pari-mutuel betting on dog racing. The court *Page 33 
distinguished Cabazon, concluding that New Mexico's total prohibition against other forms of pari-mutuel betting precluded application of the Cabazon analysis. No appellate court has considered this issue post-Cabazon, however.
Undoubtedly, tribes at minimum would be allowed to conduct on-track pari-mutuel betting at a tribal horse or dog track free of state regulation once the Legislature passed a statute authorizing betting on these activities. The general public would no longer be prohibited from engaging in the activity. It is clear that the voters intended to have horse racing (and perhaps dog racing) because that is generally what is meant by pari-mutuel betting.
Indians probably cannot establish off-track pari-mutuel gambling parlors on reservations, however because the amendment specifically allows only "on track" pari-mutuel betting. There is a long-standing distinction between allowing on- and off-track betting in various states. Off-track is generally prohibited even when on-track is allowed. However, off-track betting done inside of a legal race track on a race run out of the state is legal in many states and is regulated by Title 15 U.S.C. ch. 57 — Interstate Horseracing. Indians might be able to do this if, under the federal legislation, Wisconsin is considered a "separate state" from the reservation. Carefully drafted legislation could help to eliminate any uncertainty in this regard. The legislation should indicate that Wisconsin does not consider on- and off-track betting to be the same activity and should state the policy reasons for totally prohibiting all off-track betting.
With respect to some activities, the distinction between pari-mutuel betting and participation in a lottery is not clear. For example, in Opinion of the Justices, 385 A.2d 695 (Del. 1978), the majority found that "pool-selling" on jai-alai games was not a form of lottery because pool-selling has historically been held to be a different activity from lotteries. If this sports betting were characterized as pari-mutuel betting, however, and not as a form of lottery, it might be allowed. The distinction between sports betting and lotteries is artificial, as evident from the federal law regarding lotteries. Congress felt it necessary to specifically state that lottery does not include "the placing or accepting of bets or wagers on sporting events or contests." As noted, Wisconsin's lottery legislation effects the same result by limiting the lottery board's choice of lottery *Page 34 
games to those for which winners are not selected based on the results of a race or sporting event.
Also on-reservation betting on horse, dog or similar races, the outcome of which is determined by a mechanical device, may be prohibited under the current federal law which forbids slot machines or video gambling machines on Indian Country,15 U.S.C.A. § 1175 (1982). Only the federal government may enforce these laws. State statutes would have to specifically prohibit these forms of gambling before such laws could be applied concurrently.
III. JURISDICTION, IF ANY, THE STATE DOES HAVE IN RELATED MATTERS.
A. Advertising On And Off The Reservation.
Wisconsin law regulating gambling related advertising would not apply on Indian reservations unless the state interests at stake are sufficient to justify the assertion of state authority. SeeNew Mexico v. Mescalero Apache Tribe, 462 U.S. 324. 333-34 (1983). It is doubtful whether the state's interest in regulating gambling advertisements within reservation boundaries is sufficient to overcome the congressional and tribal interest in encouraging tribal self-sufficiency and economic development. The ability of a tribe to promote its gambling business through advertisements within reservation boundaries would appear to be inextricably linked to the success of that business. The United States Supreme Court's focus on factors such as these strongly suggests that state regulatory authority in such matters is preempted by overriding federal and tribal interests. SeeCabazon, 480 U.S. at 215-21.
Whether the state can regulate Indian advertising outside reservation boundaries requires a somewhat different analysis. Where off reservation activities are at issue, the Supreme Court has stated the general rule as follows: "Absent express federal law to the contrary Indians going beyond reservation boundaries have generally been held subject to nondiscriminatory state law otherwise applicable to all citizens of the state." MescaleroApache Tribe v. Jones, 411 U.S. 145, 148-49 (1973) (citations omitted); see also, White Mountain Apache Tribe v. Bracker,448 U.S. 136, 144 n. 11 (1980); New Mexico v. Mescalero Apache Tribe,462 U.S. at 335 n. 18 (1983), quoted in Oregon Dept. of Fish v.Klamath Ind. Tribe, 473 U.S. 753, 765 n. 16 (1985). I am not aware of any federal law expressly prohibiting the state from regulating Indian advertising in *Page 35 
the same fashion advertising by others is regulated statewide. Accordingly, it is my opinion that the state does have regulatory authority over Indian gambling advertisements outside reservation boundaries.
B. Gambling By Minors.
I see no reason to think that laws making it criminal for persons to allow gambling by minors (as most states have) should not apply on reservations. It should not be difficult to show that gambling by minors is against public policy and generally prohibited. In addition, tribal governments probably have ordinances against gambling by minors. I am not aware of any case where minors have been gambling on Indian reservations. Even if the laws are not enforceable as criminal laws, they probably will pass the preemption/infringement test because the state's interest in children is strong.
C. Oversight Authority of The State Gambling Commission.
The lottery board, like the bingo control board, is primarily a regulatory authority. I assume the same will be true with respect to the board overseeing on-track pari-mutuel betting. Because such boards are concerned primarily with regulatory issues, they would not have any independent oversight authority over tribal gambling operations conducted within reservation boundaries. As indicated above, if the state interests at stake with respect to a particular subject area within a board's jurisdiction are sufficient to justify the assertion of state authority, then the board would have oversight authority on Indian reservations concerning that subject.
D. Background Checks On Operators.
The authority of the state to conduct background checks on operators of tribal gaming operations also is regulatory. InCabazon, one of the bingo laws not enforceable on reservations concerned operator qualifications. The Court rejected the state's argument that it was trying to prevent organized crime. State arguments concerning the importance of keeping corrupt individuals out of tribal gambling businesses, or from taking advantage of their state citizens, would probably fail given the similar Cabazon facts.
DJH:JDN
[1] The term "Indian country" is defined in 18 U.S.C. § 1151. It means "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same." This definition applies whether the question involves criminal or civil jurisdiction. DeCoteau v. DistrictCounty Court, 420 U.S. 425, 427 n. 2 (1975). The terms "reservation" and "Indian country" are used interchangeably herein. Any land held in trust for an Indian tribe may qualify as a "reservation." See 71 Op. Att'y Gen. 82 (1982). *Page 36